LESSEE OF JOHN MERCER, AND MARY SCOTT MERCER, HIS WIFE, PLAINTIFFS IN ERROR, v. WILLIAM CARY SELDEN, DEFENDANT.

The statute of limitation of Virginia, passed in 1785, barred the right of entry, unless suit was brought within twenty years next after the cause of action accrued. The savings are infancy, coverture, &c., and such persons are barred if they do not bring their action within ten years next after their dis-. abilities shall be removed.

The circumstances under which the defendant held in this particular case, constitute an adverse possession.

Disabilities which bring a person within the exceptions of the statute cannot be piled one upon another; but a party, claiming the benefit of the proviso, can only avail himself of the disability existing when the right of action first accrued.

The general rule of law is, that there must be an entry during coverture, to enable the husband to claim a tenancy by the courtesy.

THIS case was brought up by writ of error from the Circuit Court of the United States for the eastern district of Virginia.

The facts in the case are stated in the commencement of the opinion of the court, which the reader is requested to turn to and peruse, before referring to the sketch of the arguments of counsel.

The decision of the court being made to rest entirely upon the statute of limitations, all those branches of the argument relating

D

to the invalidity of the deed from Selden and wife to Dr. Mackay, on account of its not having been read to her, and of a defect in its acknowledgment, are omitted.

*Whipple* and *Walter Jones,* for the plaintiffs.

*Chapman Johnson,* for defendant.

On the part of the plaintiffs, it was argued: 1. That Mrs. Swann and her children were within the express exceptions of the statute; under the double disability of infancy and coverture.

2. That no disseisin or adverse possession is operated by any length of continued possession, however hostile may be the new pretence of title under which possession is held over, if the possession were not tortious at its inception, but in subordination to or consistent with the true title.

3. That this is especially true where a husband, who having rightfully come into possession *jure uxoris,* holds out possession against her heir after descent cast by her death; however hostile the claim and strong the colour of exclusive title asserted for himself; and though the heir be *sui juris,* and in no nearer relation to husband and wife than simply as her heir at law.

4. That the intrusion, even of a mere stranger, on lands descended to an infant, constitutes the intruder, *ipso facto,* a fiduciary possessor, *quasi* guardian, subject both at law and in equity to all the duties and liabilities of such fiduciary possessor, and utterly incapable of converting his fiduciary possession into a disseisin or adverse possession.

5. *Multo fortiore,* when, as in this case, the heirs were not only infants, but united in their persons all the relations of his step-children, of co-heirs to his wife, and his wards; when the guardian care and conservation of all their rights of property and of possession had devolved, as a strict legal duty, on him *ex officio.*

6. That the right of action had never accrued when the infants had a right to sue, being restrained either by coverture or a tenancy by the courtesy.

On the part of the defendant, it was argued, that none of the exceptions in the statute have any application to this case, but those in favour of infants and femes coverts. The right of entry of Mrs. Mercer's mother, and of her uncle, John Page, accrued at the death of Mrs. Selden, in 1787; or, at the latest, accrued to

John Page when he attained full age, prior to 1792, and to Mrs. Swann when she was married, in April, 1794.

First, as to John Page.

His disability of infancy being removed, and the guardianship account being settled in 1792, his right of entry, if any remained to him, certainly accrued as early as the 21st of December, 1792, when he was under no disability, and so he remained until his death in the year 1800.

The statute having begun to run against him in his lifetime, runs over all subsequent disabilities. Adams on Ejectment, 59; 2 Preston on Abstracts, 339; Blanchard on Limitations, 19, in the first vol. of the Law Library, 10; Jackson dem. Colden v. Moore, 13 Johns. 513; Jackson dem. Livingston v. Robins, 15 Johns. 169; Fitzhugh v. Anderson, 2 Hen. and Mumf. 306; Hudson v. Hudson's Adm., 6 Munf. 355; Parson v. McCracken, 9 Leigh. 501, 507.

Secondly, as to Mrs. Swann.

Her right of entry accrued either when she was an infant and unmarried at the death of her mother, or when she was both an infant and a married woman, in April, 1794. Her disability of infancy ceased a few months after her marriage, and her disability of coverture ceased at her death, in 1812. But so far as regards her daughter, Mrs. Mercer, there has been a succession of disabilities from the death of Mrs. Selden to the present day.

Can these disabilities be united so as to continue her protection?

The authorities relied upon to maintain the power of tacking disabilities, are Blanchard on Lim. 19, 20, in Law Library, 10, 11; 2 Preston on Abstracts, 340; Cotterell v. Dutton, 4 Taunton, 826. But even Blanchard's opinion is, that successive disabilities in different persons cannot be connected; and Preston states that the later decisions are, that successive disabilities cannot be united, 2 vol. p. 341; and the following authorities prove that they cannot: Adams on Ejectment, 60; 6 East, 80; approved in Tolson v. Kaye, 3 Broderip and Bingham, 223, decided in Common Pleas, in 1822; Eager and wife v. Commonwealth, 4 Mass. 182; Griswold v. Butler, 3 Conn. Rep. 227; Floyd v. Johnson, 2 Littel, 114; Clay's heirs v. Miller, 3 Monroe, 148; Thompson v. Smith, 7 Serg. and Rawle, 209; Demarest and

wife *v.* Winkoop, 3 Johnson's Ch. Rep. 129; Jackson *v.* Wheat, 18 Johns. 40; Jackson *v.* Johnson, 5 Cowen, 74; Bradstreet *v.* Clarke, 12 Wendell, 602; Doe dem. Lewis *v.* Barksdale, 2 Brock. 436; Parsons *v.* McCracken, 9 Leigh. 495. In the last case Judge Parker cites the case of Swann *v.* Selden, as authority for the same proposition, it having been recognised by Judges Cabell and Brockenborough.

If the plaintiffs are not within the exceptions to the statute, then the question is, whether, supposing them to be under no disability, they are within the principle of the statute; or, in other words, has there been an actual adversary possession in the defendant, and those under whom he claims, for fifteen years before bringing this suit?

Here it must be remembered that we are trying this question, not upon the testimony of witnesses, not upon the evidence of facts from which other facts may be inferred, but upon a special verdict finding all the facts, and leaving to the decision of the court the naked question of law, whether these facts constitute a possession which the statute of limitations will protect. In Bradstreet *v.* Huntingdon, 5 Peters, 402, it is said, " Adverse possession is a legal idea, admits of a legal definition, and is therefore a question of law."

Taylor dem. Atkyns *v.* Horde, 1 Burrow. 60, was upon a special verdict finding the facts, and referring the law to the court; and in that case it being ascertained that the plaintiff's right of action had accrued more than twenty years before the bringing of the suit, he was regarded as having the *onus* thrown upon him of showing why he had not sooner entered. This case is reported also in Cowper, 689, and 6 Brown's P. C. 633; it is also stated in 3 Cruise's Dig. title 31, c. 2 and 33.

In this case, (Taylor *v.* Horde,) the verdict did not find that the possession was adversary; but it found the facts upon which the court pronounced that the plaintiff's title was barred by the statute. The case seems to have been briefly this. There was tenant in tail with power to make leases for lives, and with remainder in tail to the right heirs of the grantor. The tenant in tail made leases for three lives, and afterwards suffered a common recovery with a view of barring the entail, and cutting off the remainders limited thereupon. The person entitled to the re-

mainder in fee died, having devised it to the lessor of the plaintiff. The tenant in tail afterwards died in the year 1711 without issue, and his heir, claiming under the common recovery, entered, and he and those claiming under him continued to hold the land till the year 1753. The survivor of the three lessees for life died in 1752, and then the devisee of the remainderman in fee entered and made the lease on which the action was brought. The defendants defended themselves upon two grounds: 1st, that the common recovery had barred the remainder in fee; and 2d, that if it had not, the statute of limitations had barred the entry of the plaintiff. The plaintiff insisted that the common recovery was void for want of a proper tenant to the *præcipe*, and so the court held. The plaintiff also insisted that his right of action did not accrue till the death of the surviving lessee for life, so that there was no bar of his entry; but the court held that the lease for lives was void, so that the plaintiff's right of entry accrued in 1711, and was barred by the statute. This judgment of K. B. was affirmed in House of Lords.

La Trombois *v.* Jackson, 8 Cowen, 589, was also a case of a special verdict, finding the facts, which the court held to amount to an adverse possession. The facts which, in the opinion of the court, constituted an adverse possession in the defendant were, long possession under a contract for a future conveyance from a person not shown to have had any title, improvement and cultivation. His long possession and enjoyment of the property, claiming it as his own, was held sufficient. The fact of possession, and the *quo animo* it was commenced and continued, were regarded as the tests of adversary possession. See page 609.

Clay *v.* Ransome, 1 Munf. 454, was the case of a special verdict finding possession in the defendant. Held that the defendant would have been protected if it had been found with certainty that such possession had continued twenty years, besides the five years and one hundred and seventy-four days, included by the act of Assembly on account of the war; and this being left uncertain, a *venire de novo* was awarded.

Let us examine what there is in our case which should make the possession of Dr. Selden and his son fiduciary.

Shall fraud or trust be imputed to its origin? Both these grounds have been fully investigated in the Court of Chancery,

and both repudiated by the final decree of that court, affirmed by the Court of Appeals.

But if they could be resorted to here, then the statute would run against the fraud from the time it was discovered, and would run in favour of the trustee from the time that the trust was openly repudiated.

As to fraud, see Wamburzee *v.* Kennedy, 4 Desauss. 479; Sweat *v.* Arrington, 2 Hayw. 129; Thompson *v.* Blair, 3 Murphy, 583; Van Rhyn *v.* Vincent, 1 McCord's Ch. R. 314.

As to trust. It is held that time will bar even an express voluntary trust, beginning to run from the period of its known disavowal. See Blanchard on Lim. 75, 1 Law Library, 39; Pipher *v.* Lodge, 4 Serg. and Rawle, 310; Boone *v.* Chiles, 10 Peters, 223; citing Willison *v.* Watkins, 3 Peters, 52; Kane *v.* Bloodgood, 7 Johns. Ch. R. 122; Hovenden *v.* Lord Annesley, 2 Sch. and Lef. 607, 636, 638.

And as to constructive trusts, see the same case of Boone *v.* Chiles, 10 Peters, 223, where it is said, "Though time does not bar a direct trust as between a trustee and *cestui que trust* till it is disavowed, yet where a constructive trust is made out in equity, time protects the trustee, though his conduct was originally fraudulent, and his purchase would have been repudiated for fraud." Citing for this, Andrew *v.* Wrigley, 4 Bro. Ch. C. 138; Beckford *v.* Wade, 17 Vesey, 97; Townsend *v.* Townsend, 1 Bro. Ch. C. 554. So the Court of Appeals of Virginia, in the case of Harrison *v.* Harrison, 1 Call, 428, holds this language: "The act of limitations does not run in favour of trustees, so long as the confidence may be fairly presumed to continue; but it runs both at law and in equity in favour of disseisors and *tort-feisors* having adverse possession."

So, though it is said in some cases in Johnson's Reports, cited on the part of the plaintiffs, that the adversary possession, to constitute a bar, must have been hostile in its inception, and so continued for twenty years; yet this phrase, "hostile in its inception," does not relate to the original entry of the defendant, but to the act by which the possession became adversary; in other words, whether the possession was originally hostile or not, it must have been hostile twenty years ago, and have continued so ever since. See Jackson *v.* Brink, 5 Cowen, 483.

Shall the defendant be treated as tenant for life holding over, so as to make him tenant by sufferance? This is repelled by special verdict, which finds .that he held under claim of title, and took the rents.and profits to his own use. But an express and acknowledged tenancy, as soon as the tenancy is disavowed and the right of the landlord openly denied, will become adversary. See Willison v. Watkins, 3 Peters, 49; Peyton v. Stith, 5 Peters, 485. Cited, 1 Pet. Digest, p. 148, pl. 32; also the pertinent case, Doe dem. Parker v. Gregory, 4 Neville and Manning, 308. Husband in possession, in right of his wife, held over after her death for more than twenty years; there being no evidence to show under what right he held or claimed to hold after her death, this possession barred the wife's heirs in ejectment.

Shall he be regarded as one entering under a void title, so that his possession would be regarded as subordinate to the title of the legal owner?

The special verdict ascertains that the fact is not so. For however ineffectual in law the conveyances may be to pass the legal title of Mrs. Selden, yet Dr. Selden did not enter under her deed, but under the deeds of Robert Mackay and Cary Selden, which, though they might not have conveyed a good title, are not void in law. Under this head the plaintiffs may rely upon the cases of Jackson v. Waters, 12 Johns. 365; Jackson v. Cairns, 20 Johns. 301; also, perhaps, on some other cases referred to in Adams on Ejectment, Appendix A, p. 464—468. After the decision of Jackson v. Waters, by the Supreme Court of New York, the case of Jackson v. La Trombois came before the same court, in respect to the same title, but between different parties. The Supreme Court thought the case not distinguishable from Jackson v. Waters, and held, accordingly, that the possession of the defendant was not adversary. But this last case coming before the Court of Errors of New York under the style of La Trombois v. Jackson, 8 Cowen, 589, the judgment of the Supreme Court was unanimously reversed. The Court of Errors thought the case very distinguishable from Jackson v. Waters, which they did not profess to overrule; but the opinions of the judges on the doctrine of adversary possession produce the impression that they would have decided Jackson v. Waters differently.

But these cases furnish no warrant for the proposition that a

possession commencing under a void title may not become ad-
versary.

The case in 12 Johnson, Jackson v. Waters, repudiates all claim
under the grant of the French Canadian government, as a go-
vernment altogether foreign to the colonial government of New
York; so as to liken the possession of one claiming under such a
grant to the possession of one without claim—upon the ground
that such a grant was notoriously void, and so known to be by
the person in possession under it. But the possession in that case
was manifestly such as not to have created a bar, even if it had
been adversary, and there is a strong intimation that it might
have been ripened into a complete bar to the action.

Jackson v. Cairns, 20 Johns., was the case of a conveyance in
fee of the wife's lands by deed of husband and wife, not exe-
cuted by the wife so as to be obligatory upon her, and an imme-
diate re-conveyance of the property to the husband in fee. The
husband thenceforward claimed the land as his own, and mort-
gaged it for the payment of his debts. The wife died in 1795,
having had issue by the marriage, and afterwards the husband
died in 1802. His son and heir took possession, and made an-
other mortgage upon the lands. The mortgage made by the hus-
band was foreclosed in 1805, and under the decree of foreclosure,
sold to Cairns, who held possession under the purchase till the
heir of the wife brought his action of ejectment in 1817. The
court held that as the original conveyance was void as to the
wife, it could be regarded as the conveyance of the husband
alone; that under the statute 32 Henry 8, and a similar statute
in New York, the conveyance of the husband and wife operated
to convey only his interest in the estate; that is, his tenancy by
the courtesy, and produced no discontinuance of his wife's estate;
that the re-conveyance to him operated only to re-vest him with
his former estate. That, in like manner, the mortgage produced
no discontinuance of his wife's estate; so that, after her death,
his possession was that of tenant by the courtesy. The title of
his wife's heir to the possession had not yet accrued, and his pos-
session could not be adversary to the heir. They intimated an
opinion that the mortgage by his heir did not render the posses-
sion adversary, but did not decide this point, as it was unneces-
sary. They consider the possession as becoming adversary at

the time of Cairns's purchase, in 1805. But this was within the period of limitation; they therefore held that the action was not barred.

Here it is obvious that the right of entry never accrued to the wife's heirs until the death of the husband, who had good title as tenant by the courtesy; and as but fifteen years had elapsed after the right of entry had accrued, the statute presented no bar.

But we maintain that the doctrine which assumes that possession, commencing under a void title, cannot become adversary and be protected by the statute, is in conflict with the principle of the statute and all the authorities.

The principle of the statute is to quiet possessions, and to protect tenants, after a reasonable length of time, from the necessity of exhibiting any title whatever.

The following considerations and cases are illustrative of the policy of the statute of limitations, and the favour with which it is regarded by the courts.

1. The statute of limitations has been emphatically called a statute of repose, &c. Beatty's Adm. v. Burnes's Adm., 8 Cranch, 98; 3 Cond. R. 51.

2. The statutes of limitation ought not to be viewed in an unfavourable light, as an unjust or discreditable defence, but should receive such support from the courts as would make it what it was intended to be, a statute of repose. It is a just and beneficial law, &c. Bell v. Morrison, 1 Peters, 360.

3. " Of late years the courts of England and in this country have considered statutes of limitation more favourably than formerly. They rest upon sound policy, and tend to the peace and welfare of society. The courts do not now, unless compelled by the force of former decisions, give a strained construction to evade the effect of those statutes. By requiring those who complain of injuries to seek redress by action at law within a reasonable time, a salutary vigilance is imposed, and an end is put to litigation." McClung v. Silliman, 3 Peters, 270.

4. " Statutes of limitation have been emphatically and justly denominated statutes of repose. The best interests of society require that causes of action should not be deferred an unreasonable time. This remark is peculiarly applicable to land titles. Nothing so much retards the growth or prosperity of a country

as insecurity of titles to real estate.    Labour is paralyzed when the enjoyment of its fruits is uncertain; and litigation without limit produces ruinous consequences to individuals."   The court therefore approves the Kentucky statutes of limitation.   Bradstreet v. Huntington, 5 Peters, 407. .

5.  " From as early a date as the year 1705, Virginia has never been without an act of limitation; and no class of laws is more universally sancuioned by the practice of nations and the consent of mankind, than those laws which give peace and confidence to · the .actual possessor and ·tiller of the soil," &c.  · Hawkins et al. v. Barney's lessee, 5 Peters, 457.

The course of Kentucky approved, even her "seven years· law;" same.case.  And among English cases, see the modern one of Tolson v. Kaye, ·3 Bro. and Bing. 217, decided in Common Pleas, in 1822.

The case of Taylor v. Horde, already cited, is an authority to prove that possession held under a void common recovery was protected by the statute of limitations.

In Smith v. Bentis, 9 Johns..180, Spencer, delivering the opinion of the court, said :  " It has never been considered as necessary to constitute an adverse possession that there should be a rightful title.   Whenever this defence is set up, the idea of right is excluded; the fact of possession and the *quo animo* it was commenced or continued are the only tests, and it must necessarily· be exclusive of all other rights."

In Smith ·v. Lorillard, .10 Johns. 356, C. J. Kent said, in delivering the opinion of the court, that " after a continued possession for twenty years under pretence or claim·of right, the actual possession ripens into a right of possession, which will toll an entry." See also La Trombois v. Jackson, 8 Cowen, 589, especially the opinions of Jones, (Chancellor,) p. 602; 603 ; and Spencer, p. 609— 611, citing Jackson v. Wheat, 18 Johns. 44; Jackson v. Newton, 18 Johns. 355; Jackson v. Woodruff, 1 Cowen, 286. ·

In. Jackson v. Newton, 18 Johns. 355, the possession of the· defendant was held under a defective deed, a deed without a seal, which, therefore, passed no title, yet was considered adverse, and having continued for twenty years, barred· the plaintiff's entry.

Ewing v. Burnett, 8 Peters, 41, holds that adverse possession

of twenty-one years under claim or colour of title merely void, is a bar to a recovery under an elder title by deed, although the adverse holder may have had notice of the deed. This was the case of an unenclosed lot in Cincinnati.

Harpending *v.* The Dutch Church, 16 Peters, 455, held that the title of a devisee, entering under a void devise, may be protected against the heirs by the statute of limitations. See also Hudson *v.* Hudson's Adm., 6 Munf. 355, and 5 Peters, 354; also Patton's lessee *v.* Easton, 1 Wheat. 479.

Lastly, shall Dr. Selden be regarded as having entered. as guardian, and therefore holding in subordination to the title of his wards?

This fact is also repudiated by the special verdict, which finds that he entered in his own right; and by the decree of the Court of Chancery, which has rejected all claims against him as guardian.

But if he did enter as guardian, that guardianship has been long since terminated and the accounts finally settled. There is no authority to prove that a guardian will not be protected by the statute of limitations after his guardianship has terminated. On the contrary, Littleton, sect. 124; Co. Litt. 896, 90 a; Cro. Car 229; Cro. Jac. 219; which show that the guardian, whether *de jure* or *de facto*, whether *proprius tutor* or *alienus tutor*, is liable to the action of account on the part of his ward, show necessarily that he is entitled to the protection of the statute, because the action of account is expressly limited by the statute. It was so by the statute of James, and is so by that of Virginia.

So too, in equity, where the guardian is held to account for rents and profits, the court will lay hold of " any such thing" as a waiver of the account after the infant came of age, to put an end to the claim. Morgan *v.* Morgan, 1 Atkyns, 489.

Why should not the possession of a former guardian under a claim of right in himself, and a long and notorious application of the profits to his own use, as effectually disseise his former wards, and entitle him to the protection of the statute, as the possession of a tenant in common, joint tenant, or coparcener, denying the right of his co-tenant, and applying the profits to his own use, would disseise his co-tenant, and entitle the disseisor to the protection of the statute of limitations? See Adams on Ejectment, 56;

Blanchard on Lim. 9, 1 Law. Lib. 5; Fisher *v.* Prosser, Cow-per, 218; Doe dem. Stellings *v.* Bird, 11 East, 50.

The case of Swann *v.* Selden, in the Court of Appeals, has decided the very question we are now considering. The opinions of Judges Brockenborough and Cabell, constituting the majority of the court, have held that the statute was a complete bar to all the equitable claims preferred in that cause. The case is not reported, but adduced in manuscript.

The opinion of the court was delivered by Mr. Justice McLEAN.

This case is brought before this court, from the Circuit Court of the eastern district of Virginia, by a writ of error.

An action of ejectment was commenced by the lessors of the plaintiff, to recover possession of certain undivided interests in a tract of land in Loudon county.

On the trial, the jury found a statement of facts, on which the questions of law mainly arise.

Mary Mason Selden was seised and possessed in fee simple of certain tracts of land in the county of Loudon, estimated to contain four thousand acres, a part of which is the land in controversy. She intermarried with Mann Page, who died in 1779, leaving his wife and three infant children, John, William Byrd, and Jane Byrd. Mrs. Page continued a widow, seised in her own right, until 1782, when she married Wilson Cary Selden; who in right of his wife entered upon and held the lands. Soon after the marriage, Selden became guardian of the three infant children aforesaid, gave bonds, &c., and continued to act as guardian during the minorities of the two sons, and until the marriage of the daughter.

On the 22d December, 1784, Selden and wife conveyed in fee simple to Cary Selden, father of the husband, the whole of the four thousand acres of land, with the exception of two thousand acres deeded to W. B. Page. Mrs. Selden was privily examined as the statute requires. This deed was acknowledged and recorded by Selden the 14th April, 1818, long after the decease of the grantee. On the 1st January, 1785, Cary Selden and wife re-conveyed the land, with the exception above stated, to Wilson C. Selden; which deed was also recorded the 14th April, 1818.

Selden and wife, previously to the execution of the above

deed to Cary Selden, made a deed to William Byrd Page, son of Mrs. Selden by her first marriage, for two thousand acres, part of the above tract of four thousand acres; which deed was never recorded and cannot now be found. From the time of their marriage, Selden and wife had their permanent dwelling in the county of Gloucester, until they removed to the county of Elizabeth City, where they established their residence. In September, 1787, Mrs. Selden, being in a low state of health, accompanied by her husband on a return from the Springs, was taken extremely ill at Winchester, in Frederick county, Virginia, where she died on the 17th of that month. Two days previous to her death Mrs. Selden, with her husband, executed a second deed to William Byrd Page, for two thousand acres by certain metes and bounds, and also a deed to Doct. Robert Mackay for two thousand acres, being the residue of the four thousand acres in Loudon aforesaid. On the 17th, it being the day of her decease, the privy examination of Mrs. Selden was taken to the above deeds, by three justices of the peace of Frederick county, under a commission issued by the clerk of Loudon county. Selden, on the 8th October, 1787, acknowledged the above deeds, and they were ordered to be recorded. On the 17th September aforesaid, and after the decease of Mrs. Selden, Mackay re-conveyed the land conveyed to him as above stated, to Wilson C. Selden. This deed was recorded the 8th October ensuing.

From the time of his marriage to the decease of Mrs. Selden, Selden, in right of his wife, held possession of the premises in controversy. After her death he continued to hold possession, taking the rents, issues, and profits for his own use; claiming the land under the above deed. In 1818, when the legal sufficiency of that deed was questioned, he caused the deeds to and from his father to be recorded, as above stated, and so continued to claim the premises under both deeds, and to exercise acts of ownership over the land until his death, in 1835. Between the years 1796 and 1812, Selden sold, conveyed, and delivered possession to different persons, and among others to Thomas Swann, who had intermarried with Jane Byrd Page, various parcels of the land.

In April, 1794, Jane Byrd Page, with the consent of her guardian, she being under twenty-one years of age, married

Thomas Swann; and died the 31st October, 1812, leaving seven infant children, her heirs at law. Among others, Mary Scott, one of the lessors of the plaintiff, who, in June, 1818, being under twenty-one years of age, intermarried with John Mercer, one of the lessors of the plaintiff. In 1796, having received from Selden £640, Thomas Swann executed a receipt, fully discharging him as guardian. John Page, the eldest son of Mrs. Selden, died in 1800, having devised all his estate, real and personal, after the death of his widow, Elizabeth K. Page, to two of the children of his brother William Byrd Page, to wit: William B. Page and Mary M. Page, and to three of the children of his sister, Jane B. Swann, to wit: Edward, Mary, and Thomas, as tenants in common. Edward and Thomas died intestate, and without issue. Mary intermarried as above stated with John Mercer.

After John Page, the above testator, had attained full age, on the 21st December, 1792, he settled with Selden, his guardian, and executed to him a release from all demands.

Thomas Swann, surviving his wife, conveyed by deed duly executed all his interest in the premises to his surviving children.

After William Byrd Page had attained full age, he made a claim against Selden, on account of inequality in the partition of the aforesaid four thousand acres of land, which claim was finally adjusted by the payment of one thousand pounds, and the purchase of five hundred acres of his land by Selden. And afterwards, on the 23d July, 1794, Page, having received full satisfaction from Selden as guardian, executed to him a release, &c.

From the death of Wilson Cary Selden up to the present time, the defendant, his son, has held the actual possession of the premises in dispute, claiming the same as his own, under the will of his father.

On the 6th December, 1819, the lessors of the plaintiff, claiming as heirs of Mrs. Swann, with others, instituted their suit in the Superior Court of Chancery held at Winchester, against Wilson Cary Selden and others, claiming the lands now in controversy, upon certain defects in the conveyances under which Selden claimed, and upon alleged equities. Answers were filed, and upon the final hearing in October, 1830, a decree was pronounced, whereby the court, "disclaiming jurisdiction of the alleged imperfections in the conveyances aforesaid, but taking jurisdiction

of the matters of equity, adjudged and decreed that the plaintiffs' bill should be dismissed with costs, but without prejudice to any suit at law which the plaintiffs might be advised to prosecute on account of the alleged legal defects, or want of validity in the said deeds." This decree, on an appeal to the Supreme Court of Appeals, was affirmed the 17th of April, 1837.

This cause has been ably and elaborately argued. Some points have been made and illustrated with great research and ingenuity, which, from the view taken of the case by the court, are not essentially involved in the decision. Among these are the construction of the statutes under which the deed from Selden and wife to Cary Selden, in 1784, was executed and recorded; and also the deed from Selden and wife to Mackay, in 1787.

We will consider the case in reference to the statute of limitations.

The statute of 1785 bars the right of entry, unless suit be brought within twenty years next after the cause of action accrues. The savings are "infancy, coverture, non compos mentis, imprisonment, or not being within the commonwealth at the time the right of action accrued." And such persons are barred if they do not bring their action within ten years next after their disabilities shall be removed.

Selden took possession of the premises in controversy, claiming them as his own under the deed from Mackay, in the fall of 1787. Prior to that time, his possession was in right of his wife. Under the deed from Mackay his possession was adverse to the right of the lessors of the plaintiff. He avowed his ownership by placing the deed upon record, by enjoying the profits of the land, and by selling and conveying different parcels of it.

In no sense can he be considered as holding possession, in virtue of his rights as guardian of the heirs of his deceased wife, or as tenant by the courtesy. The right under which he held possession during the life of his wife terminated at her death, there being no issue of the marriage. From this time he possessed and claimed the premises as his own. This was notorious to the public, and especially to the heirs of his wife. John Page, in his lifetime, settled with Selden as guardian, and executed to him a release of all demands. William Byrd Page received from him one thousand pounds, the estimated difference in value between

the part of the four thousand acres conveyed to him over that which was conveyed to Page. Thomas Swann, the husband of Jane Byrd Page, actually purchased from Selden a part of the land conveyed to him by Mackay. Swann, at the time of the purchase, was a highly respectable lawyer, and not only knew that Selden claimed the land adversely, but he recognised the validity of such claim by the purchase.

Until his death in 1835, Selden continued in possession of the premises, and his son, the defendant, still holds the same adversely under his father's will. From these facts it is clear that the lessors of the plaintiff are barred by the statute, unless they shall bring themselves within its exceptions.

The right of action accrued in 1787. At that time Jane Byrd Page, being an infant, was within the exception of the statute, and it is insisted that her marriage with Swann before she was twenty-one years of age, added to her first disability that of coverture.

Mr. Preston, in his Abstracts, 2 vol. 339, says, "If the right accrues to a person who is at that time under a disability, the fine will not begin to run against him till he shall be free from disability; and successive disabilities, without any intermission, will continue to him a protection against being barred by nonclaim: but any cessation of disability will call the statute into operative force, and no subsequent disability will arrest the bar produced by the statute."

The saving in the Virginia statute is the same as that of the 21st of Jac. 1, but it has received in this country a different construction from that stated by Mr. Preston. In Parsons v. McCracken and wife, 9 Leigh. 495, Mr. Justice Parker says, speaking of this statute, "I am of opinion that cumulative disabilities ought not to prevent its operation; and that upon a sound construction of the act, a party claiming the benefit of the proviso can only avail himself of the disability existing when the right of action first accrued; since, otherwise, the assertion of claims might be postponed for the period of the longest life, and possessions disturbed after sixty, eighty, or even a hundred years." In that case, as in the one under consideration, the female in whom the right vested, married before the disability of infancy had ceased.

In the. same case Mr. Justice Brockenborough says, " If she married after she became of age, her subsequent coverture was not a disability which would obstruct the operation .of the statute ; and even if she married while yet an infant, we cannot mount one disability on another so as to prevent a continuous obstruction to its operation." Mr. Justice Tucker says, " It is true that Rebecca was an infant, but she came of age in 1824, when her disability ceased ; for, notwithstanding some loose opinions to the contrary, she cannot tack the disability of marriage to that of infancy."

The same doctrine was recognised by the Court of Appeals, in the chancery case lately decided in that court, between the parties now before us. The same principle is sanctioned 2 Hen. and Munf. 306 ; and in Eager and wife *v.* Commonwealth, 4 Mass. 182 ; Jackson *v.* Wheat, 18 Johns. 40 ; Demarest *v.* Wynkoop, 3 Johns. Ch. 129.

Chancellor Kent says, in the last case cited, " I am clearly of opinion, that the party can only avail himself of the disabilities existing when the right of action first accrued." In 1 Plowd. 375, it is laid down that, " if several disabilities exist together at the time the right of action accrues, the statute does not begin to run until the party has survived them all." In Doe *v.* Jesson, 6 East, 80, it was held that cumulative disabilities in different persons could not be added.

At the time of her marriage, in April, 1794, Mrs. Swann wanted about three months. of being of full age. Of course, in July ensuing, she was of age, from which time the statute began to operate, and in twenty years would have barred her right of entry, had she survived. But her death in 1812 arrested the operation of the statute, and gave her heirs ten years within which to bring their action. The proviso in the statute, after enumerating the exceptions, among which are infancy and coverture, declares that " every such person, and his or her heirs, shall and may, notwithstanding the said twenty years are, or shall be expired, bring and maintain his action, or make his entry, within ten years next after such disabilities removed, or the death of the person so disabled, and not afterwards."

By the settled construction of this proviso, the heir has ten years to bring his action, where his ancestor is not barred. This

time is given him without reference to the time that has elapsed or the disabilities of his ancestor, if the right of entry has not been tolled.

But it is insisted that the right of entry did not devolve on the heirs of Mrs. Swann at her decease, as her husband became tenant by the courtesy.

In 1 Coke on Litt. 29, c. 4, sect. 35, it is said, "Tenant by the courtesy of England is, where a man taketh a wife seised in fee simple, or in fee tail general, or seised as heir in tail special, and hath issue by the same wife, male or female, born alive, albeit the issue after dieth or liveth, yet if the wife dies, the husband shall hold the land during his life, by the laws of England."

"And first, of what seisin a man shall be tenant by the courtesy. There is in law a twofold seisin, viz., a seisin in deed and a seisin in law. And here Littleton intendeth a seisin in deed, if it may be attained unto, as if a man dieth seised of lands in fee simple, or fee tail general, and these lands descend to his daughter, and she taketh a husband and hath issue, and dieth before any entry, the husband shall not be tenant by the courtesy; and yet in this case she had a seisin in law; but if she or her husband had during her life entered, he should have been tenant by the courtesy."

The wife at common law was endowable where there had been no actual possession, and the reason is, that during coverture she could not take possession of the lands of her husband. But actual seisin was necessary to enable the husband to claim as tenant by the courtesy. This rule was not inflexible. It yielded to circumstances, as in the case of an advowson, or rent, or where an entry was prevented by force. Litt.'s. 417, 418. In like manner, if a man have a title of entry into lands, but does not enter for fear of bodily harm, and he approach as near the land as he dare, and claim the land as his own, he hath presently, by such claim, a possession and seisin in the land, as if he had entered in deed. Litt. s. 419. And, under some circumstances, living within view of the land will give the feoffee a seisin in deed, as fully as if he had made an entry. It has been held that the husband may claim as tenant by the courtesy, without entry, wild lands of which his wife was seised, and which were not held adversely. But the general rule of law is, that

there must be an entry during coverture, to enable the husband to claim by the courtesy.

At no time during the life of Mrs. Swann, does it appear that there was an entry upon the premises in controversy by herself or her husband. On the contrary, it appears the defendant and his ancestor held the land adversely. It is clear, therefore, that Swann could not claim as tenant by the courtesy, and consequently no such right could interpose to prevent the entry of the heirs of his wife. They were bound, without regard to their infancy or other disabilities, to bring their action in ten years from the decease of their ancestor. This results from the fact, that the right of action accrued in the lifetime of their ancestor, and the rule of law, which does not admit of cumulative disabilities.

By the same principles, the devisees of John Page, who died in 1800, are also barred. The statute also bars the right of entry in William Byrd Page.

From this view of the case, it can scarcely be necessary to notice the bill of exceptions taken on the trial by the plaintiff. So far as evidence was offered to disprove the consideration named in the deed to Mackay, with the view of rendering it invalid, the evidence was properly rejected. And so far as regards the circumstances which the plaintiff offered to prove, they could have no other, if any effect, than to create a suspicion of unfairness or fraud in the execution of the deed. All matters of fraud and trust arising out of this transaction were considered and decided in the case in equity lately brought before the Court of Appeals of Virginia, by the parties to the present suit. If that jurisdiction were rightfully exercised, it concludes all questions of fraud in this case. Upon the whole, we affirm the judgment of the Circuit Court.

### ORDER.

This cause came on to be heard on the transcript of the record from the Circuit Court of the United States for the eastern district of Virginia, and was argued by counsel. On consideration whereof, it is now here ordered and adjudged by this court, that the judgment of the said Circuit Court in this cause be and the same is hereby affirmed, with costs.