## WALLACE *v.* FLETCHER *& a.*

An adverse, exclusive and uninterrupted enjoyment for twenty years of an incorporeal hereditament, affords a conclusive presumption of a grant, or right, as the case may be, which is to be applied as a *presumptio juris et de jure,* wherever by possibility a right can be acquired in any manner known to the law.

Such enjoyment, to have this effect, must be under a claim of right, with the knowledge and acquiescence of the owner, and uninterrupted.

A disability which did not exist when such adverse enjoyment commenced, nor at the time when the term of twenty years expired, will not defeat the presumption of a deed or title arising from such enjoyment.

This is an action on the case, for diverting the water from the plaintiff's mill, in New Boston, from May 1, 1848, to the date of the writ, April 26, 1850.

The plaintiff's evidence tended to show that one L. Lin-

coln, under whom he claimed, purchased the land on the south side of the Piscataquog river, in New Boston, bounded by the river, and in 1804 or 1805 erected thereon the gristmill now owned by the plaintiff, and extended his dam across the river to the north bank. J. McLaughlin then owned the land upon the north side of the river; and there was no evidence tending to show that any consent was asked of McLaughlin, or given by him, for the building of the dam, or that he, or any person in his behalf, or in his right, made any objection to its being built.

McLaughlin died in the spring of 1807, and in September of that year, one John Kelso applied to Abner Dodge, who had become the owner and occupant of the gristmill and its appurtenances, through two or three intermediate conveyances from Lincoln, and asked him if he had any objection that said Kelso should move his fulling mill, then standing about half a mile above upon the river, and set it at the north end of his mill dam, if he would give Dodge an adequate compensation. Dodge told him that he had no objection, and Kelso moved his mill, but the compensation was not fixed, though Dodge objected to his cutting away the dam till it was done. Kelso cut away a part of the dam and constructed a floom, and put his fulling mill in operation, and continued to occupy the mill till his death, in 1822. It did not appear that any other agreement was made by Kelso with the owners of the gristmill, or that any compensation was paid by him, or any rate of compensation agreed on.

It appeared that the owners of the gristmill repaired and rebuilt the entire dam, when there was occasion, and that Kelso and his heirs, so long as they retained the property, did nothing and contributed nothing towards the repairs of the dam, except to their own floom, and a few feet of plank-in between the floom and the north bank of the river, except that on one occasion when the dam was destroyed by

a freshet, said Kelso entertained at his house some of the neighbors who volunteered to assist in rebuilding it.

It appeared that at one time said Kelso being asked why he did not assist in repairing the dam, said he expected to have to pay rent for it.

In 1816, Kelso obtained of John McLaughlin, jr., and a sister of his, two of the five children and heirs of J. Mc-Laughlin before mentioned, a quitclaim deed of the land on the north side of the river, on which the fulling mill stood, and his administrator, in 1828, obtained of another daughter of said J. McLaughlin, sen., a similar deed, and there was evidence tending to show that two others of said J. McLaughlin, senior's, sons enlisted in the army in the war of 1812, and have never since been heard from.

It did not appear that said Kelso made any different claims, or made any change of any kind in his relations to the owners of the gristmill, after he obtained his deed of J. McLaughlin, jr., so long as he lived.

The evidence tended to prove that during the life of said Kelso, and ever afterwards, the owners of the gristmill claimed that they were entitled to the exclusive use and control of the entire water power created by their mill dam, on the ground that they acquired such right by first building a dam there and setting up a mill, and that it was considered in the neighborhood a disputable matter whether the owners of the north side of the river had any privilege there, but it did not appear that said Kelso ever disputed the claim in this respect made by the owners of the gristmill; on the contrary, the evidence tended to prove that during said Kelso's life, and until the sale of the interest of his heirs, in 1826, the owners of the gristmill were in the habit of calling on the occupants of the fulling mill, either personally or by rapping on the side of the gristmill, to shut down their gates, and they were accordingly closed when the river was low, and the water was needed to carry the gristmill, and that in such dry times the gates of the fulling mill were

sometimes closed by the occupants, of their own accord, and sometimes by the owners of the gristmill, and that said Kelso, at such times, sometimes fulled his cloth in the night, when the gristmill was not in operation, and sometimes took his cloth to be fulled at mills in other towns.

The evidence also tended to prove that the owners of the gristmill also claimed that the gristmill, as such, had a prior right to the use of the water, when necessary, before any other mill or machinery on the dam, and it did not appear that this right was denied or disputed by Kelso, or his heirs or representatives.

It appeared that at Kelso's decease his children were minors, and they so continued, except the eldest, for a short time, until their interest in the fulling mill and lot was sold by the eldest son, and by the guardian of the others, by license of the court of probate.

The fulling mill was leased by the administrator of Kelso's estate for two years, till 1824, and by the guardian of the children for two years more, to 1826, in March or April. These leases conveyed the fulling mill and water privilege for the clothing business, " except when there was not sufficient water for the gristmill," and it appeared that during those leases, the owners of the gristmill, when the water was low, drew all the water, and the gates of the fulling mill were shut down at such times.

A witness for the plaintiff testified that he was a referee with two others, now deceased, to settle a claim made by A. Dodge against the estate of Kelso, for compensation for the use of the water by the fulling mill. The parties stated to them that the owners of the gristmill had built the dam, and had done all that had been done to keep it in repair; that Kelso came in under an agreement to pay a reasonable compensation for the use of the water, though it had never been agreed what that compensation should be, and that Kelso had used the water for a number of years under that agreement; that the most of the year there was water enough for both,

and when there was not water enough for both, the gristmill had the preference, and when the water was low, was to have all the water. (The question submitted to them was, what the estate of Kelso should pay towards the expense of supporting the dam, or what should be paid for the use of the water, when there was water enough for both mills. He could not say what was said by Dodge or the administrator, but what was said by either was assented to by the other. There was no dispute between them. The award was produced and verified by him. It recited a submission by bonds, and, among other things, had an award of "forty dollars to be paid to Dodge for the use of the water privilege," and was dated March 26, 1823. At the foot of it was written, "We agree to the above award," which was signed by Dodge and the administrator.

To all this evidence of the acts and admissions of the administrator of Kelso's estate, and of the guardian of his minor children, it was objected that neither an administrator nor guardian has any power, directly or otherwise, to create an easement on the minors' estate, or by his acts or admissions to furnish or make any evidence of such an easement, to affect any other persons than themselves, and the whole evidence was therefore inadmissible against the grantees of the minors' estate; but the evidence was admitted, subject to exception.

It was objected that the award was not evidence of the submission by bond, without the production of the bonds, or an account of their absence, but it was admitted on the proof of the agreement of the parties, written upon it, subject to the exception as to its admission and effect.

It appeared by deeds produced by the defendants, that one of the heirs of Kelso, then of age, and the guardian of the minor children, under a license from the court of probate, sold and conveyed the fulling mill to D. Smith, on the 5th of August, 1826. Smith soon after made a contract with the defendant, Fletcher, and gave him a bond that he

would convey the property, upon the payment of an agreed price, within a certain time; that in the meantime Fletcher should occupy the premises, paying a certain rent, and that when he paid $200 toward the purchase, the rent should cease, and after that he was to pay only the interest on the balance of the purchase money.

Fletcher occupied, paying rent for two years, till 1828, and then paid the $200, and afterwards occupied as owner, paying interest only. During the time from August, 1826, to the fall of 1828, while Fletcher occupied as tenant, Smith paid to the owner of the gristmill half a dollar a month for the use of the water. He testified he paid it because it was unsettled and considered disputable, whether there was any privilege on the north side. He said he was offered a higher price, if he would warrant the water, but he considered it disputable, and declined to do it. In April, 1830, he conveyed to one Austin, under whom the defendants claim. While he owned the fulling mill, and paid rent, the owners of the gristmill claimed they had the first right to the water, and it was generally understood they had such right.

After the payment of the $200 by Fletcher to Smith, the right of the plaintiff to a preference in the use of the water, or to any rent or compensation for the use of it, was denied by Fletcher, and he ceased to shut his gates when the owners of the gristmill requested it, but it did not appear how early this resistance to the plaintiff's claim was first made.

The court instructed the jury that if the owner of the mill privilege, under a claim of right, used and exercised the rights he claimed, without interruption or opposition, for a period of twenty years, this gave him a perpetual right, and that it was not material whether his claim of right was well founded in law, if it was so exercised and submitted to. That if a party had once acquired a right by such twenty years enjoyment, he would not lose it by any interruption afterwards, unless that interruption continued for twenty years, and the burden was on the party who asserted

such interruption, to prove it. That if the jury should find that the plaintiff, under a claim of right, had used the water to the exclusion of the fulling mill, in the dry season, when there was only enough for the grist mill, or had permitted the owners of the fulling mill to draw water from the dam for the use of that mill, only on payment of a reasonable compensation, for the term of twenty years, without interruption, they should find their verdict in his favor, notwithstanding they should find that during a part of that time the title to the fulling mill was, by descent, in the hands of minors.

The jury found a verdict for the plaintiff, which the defendants moved to set aside, by reason of the said rulings and instructions of the court.

*Morrison, Fitch & Stanley*, for the defendants.

The defendants contend that no act of one who has only a temporary right in the land, can be allowed to prejudice the owner of the inheritance. Such person is not authorized to grant an incorporeal hereditament in land. The administrator of Kelso, or the guardian of the Kelso heirs, had no such interest in the premises that any act of theirs could prejudice the right of such heirs, or those claiming under them. *Watkins* v. *Peck*, 13 N. H. Rep. 377 ; 2 Greenl. Ev. 545, and cases cited.

No grant can be presumed from an adverse use of an easement in the land of another for a term of twenty years, when the owners of the land, at the expiration of the twenty years, were and for a long time had been infants, and incapable of making a grant. *Watkins* v. *Peck*, 13 N. H. Rep. 377.

This case shows that the plaintiff and those under whom he claims, and the defendants and those under whom they claim, owned the land, on the opposite sides of the same river, and each was entitled to an equal participation in the

---

Wallace *v.* Fletcher.

---

use of the water, which could only be enjoyed in common. 1 Hill. Real Prop. 51 ; Angell on Watercourses 91.

Nothing can be claimed by prescription which the law gives of common right. 2 Greenl. Ev. 541 ; *Catlin* v. *Kidder*, 7 Vt. Rep. 12 ; *Williston* v. *Watkins*, 3 Peters 51.

The award was not competent evidence to prove a submission by bond. The bond was the best evidence, and the plaintiff was bound to account for the absence of the bond. 1 Greenl. Ev. 82, 557.

The court erred in instructing the jury that if an owner of a mill privilege, under claim of right, used and exercised the right he claimed, without interruption for a period of twenty years, this gave him a perpetual right. We contend that such occupancy is not conclusive ; but the plaintiff must rely upon a presumption of a grant arising from the occupancy, and is matter for the jury. *Hoffman* v. *Savage*, 17 Mass. Rep. 130 ; *Gayetty* v. *Bethune*, 14 Mass. Rep. 49 ; Angell on Watercourses 216 ; *Master Pilots* v. *Bradley*, 10 Eng. L. & E. Rep. 386 ; *Blanchard* v. *Baker*, 8 Greenl. Rep. 253 ; *Balwin* v. *Calkins*, 10 Wend. 167 ; *Watkins* v. *Peck*, 13 N. H. Rep. 377.

*D. Cross*, for the plaintiff.

In this case, the plaintiff or those under whom he claims,. built the gristmill, maintained the entire dam, rebuilding and. repairing it, claimed the right to use all the water, and used. it from 1804 or 1805 till Kelso's death in 1822. In the fall of 1807, Kelso, by our permission, erected a fulling mill at the end of our dam, agreeing to pay " an adequate compensation " to us for the use of the water. Kelso had no right to use the water, and claimed none. He used the water subject to the gristmill, shutting down his gates, or going away to full his cloth, when the gristmill wanted the water.. He never made any repair upon the dam, and said that he expected to pay rent. The administrator, in 1822, in accordance with the agreement of Kelso to pay rent, or an ad--

equate compensation for the use of the water, submitted to
referees the amount to be paid. The guardian, too, in ac-
cordance with the long use of the water and the claim of
the gristmill, and the acknowledgment of Kelso, gave a
lease of the fulling mill, excepting the right of the gristmill
to use the water. The acts of the administrator and guar-
dian were only carrying out the agreements and understand-
ing of Kelso in regard to the two mills. They could not
act otherwise than as they did. The fulling mill was
in the hands of the administrator and guardian about four
years, they or their lessees paying rent for the water to the
gristmill. In 1826, the guardian sold to David Smith, and
he held the fulling mill two years, paying rent to the grist-
mill for the use of the water, and Fletcher, one of the defen-
dants, occupying as lessee. It appears, further, that the
gristmill used the water, and claimed the right to use it,
from 1804 or 1805 until the acts complained of in this suit.
From 1804 or 1805 until after 1828, the fulling mill never
claimed any right, but acknowledged our right. The right
of the minors, then, if any, was an intervening right, and
*Parker*, C. J., in *Watkins* v. *Peck*, cited by the defendants,
says that, perhaps, a disability intervening during the lapse
of the term, but not extending to the termination of the
period of twenty years, might not be sufficient to rebut the
presumption. In section 545 of 2 Greenleaf, cited by the
defendants, Mr. *Greenleaf* says " where the time has once
begun to run against him, (the owner,) the interposition of
a particular estate does not stop it." In Angell on Limita-
tions 520, it is said : " As this saving clause only extends to
the persons on whom the right first descends, when the stat-
ute has once begun to run, it will continue to run without
being impeded by any subsequent disability." *Hornblower*,
C. J., in *Dekay* v. *Darrah*, 2 Green (N. J.) 294, says " that
the course of decisions, both in England and in this coun-
try, has established the rule beyond doubt, that where the
statute of limitations has commenced running, it runs over

all subsequent disabilities, and intermediate acts and events," a doctrine, says Angell, fully and absolutely confirmed by the supreme court of the United States in 1843, in *Mercer's Lessee,* 1 How. 37; Angell on Limitations 521; Greenleaf's Cruise, Title 31, ch. 2, § 42.

It is true, that these parties had mills at the opposite ends of the same dam, but the plaintiff claimed the right to the whole water, and used it. The defendant acknowledged the right, and paid for the use of the water. And even if they had been at first tenants in common, we have acquired the right to the whole. *Story,* J., *Prescott* v. *Nevens,* 4 Mason 334, says " there can be no legal doubt that one tenant in common may disseize another." That one tenant in common may hold adversely against the other, and acquire the right by prescription, is decided in *Parker* v. *Locks, &c.,* 3 Met. 101; Angell on Limitations 463, and cases cited.

They were not, however, tenants in common, because the fulling mill never owned any right to the water.

It appears by the award that bonds were executed by the parties, and it also appears upon the face of the award that the parties agreed to the award under their own signatures This award, then, with the agreement, is the best evidence. The bond is usually to be produced to show what was submitted to the referees, to show their authority to act, and whether they have acted within their authority; but here it makes no difference what the bond was, because the parties agree to the award under their own signatures, and by that act make this award and agreement, the best and only proper evidence to be submitted.

The instructions of the court, that " if an owner of a mill privilege, under a claim of right, used and exercised the rights he claimed without opposition or interruption, for a period of twenty years, this gave him a perpetual right," &c., were correct. Mr. *Greenleaf,* (2 Ev. § 539,) says : " By the weight of authority as well as the preponderance of opinion, it may be stated as the general rule of American

láw, that such an enjoyment, that is, adverse, exclusive, un-
interrupted enjoyment for twenty years, of an incorporeal
hereditament, affords a conclusive presumption of a grant
or of a right, as the case may be, which is to be applied as
a *presumptio juris et de jure,* wherever by possibility a right
may be acquired in any manner known to the law. See
also to the same point, Angell on Watercourses, §§ 201,
208; *Cooledge* v. *Leonard,* 8 Pick. 504; *Melvin* v. *Whiting,*
10 Pick. 297; Greenleaf's Cruise, Title 31, ch. 1, notes to
§ 21, and cases cited.

BELL, J. At common law, a title acquired by possession
during the period and in the manner prescribed by the law,
was called a title by prescription. By the lapse of the re-
quisite time, what was at first a bare possession, becomes a
right of property, perfect and indefeasible. Gale & What.
on Easements 62.

The doctrine of the common law, as cited by *Coke,*
(Coke's Litt. 113, b.) from Bracton, (Lib. 2, fol. 51,) sub-
stantially agrees with the civil law. "Both to customs and
prescriptions, these two things are incidents inseparable;
viz.: possession or usage and time. Possession must have
three qualities, it must be long, continual, peaceable; *longa,*
*continua, et pacifica;* for it is said, *transferuntur dominia*
*sine tituo et traditione, per usucapionem; sed, per longam,*
*continuam, et pacificam possessionem. Longa, i. e., per spa-*
*tium temporis per legam definitam; continua, dico, ita quod*
*non sit legitime interrupta; pacificam, dico, quia si contentiosa*
*fuerit, idem erit, quod prius, si contentio fuerit justa."*
" *Longus usus, nec per vim, nec clam, nec precario," &c.*
G. & W. 122.

By the civil law, the rule was " *ut prescriptione longi tem-*
*poris, id est decem annorum inter presentes, et viginti inter ab-*
*sentes, servitutes adquirantur."* 1 Hei. ad Pan. part 2,
§ 158; 2 *Ib.* part 6, §§ 122–125; Domat's Civil Law, §
2190. But by the common law, the time was not fixed to

a certain number of years, but as it was expressed by Little-
ton, (Ten. § 170,) it was " *de temps dont memorie des homes
ne curt a le contrarie*," or as Coke (Coke's Litt. 115, a.)
quotes from Bracton, " *Docere oportet longum tempus et
longum usum illum ; viz. qui excedit memoriam hominum,
tale enim tempus sufficit pro jure.*"

In 1275, by statute 3 Ed. I, writs of right were limited to
rights actually enjoyed after the first year of Richard I,
(1189,) and by analogy to the period fixed by that statute,
it was held that time of legal memory reached to that date,
and not beyond it. Being a fixed date, it was of course
continually receding, until it became absurd, since it was
practically impossible to prove any fact of so ancient a
date.

The courts might have held, when difficulties were found
to result from this arbitrary rule, that the ancient law, which
fixed the period beyond which actual memory did not reach,
was still in force, or they might have availed themselves of
the passage of the statute of 32 Henry VIII, which reduced
the limitation of writs of right to three score years, to de-
cide by analogy to that statute, as was done in the time of
Edward I, that the time of legal memory was reduced sixty
years. It appears by Littleton, § 170, that in his time it
was seriously contended that the time of legal memory was
not changed by the statute of Edward I. And *Rolle*, C. J.,
was of that opinion, though he admits the practice was oth-
erwise. 2 Rolle's Ab. Prescription, P. And many respec-
table authorities maintained, after the statute of 32 Henry
VIII, that time of legal memory was sixty years, as *Rolle*,
C. J., Sergeant *Williams*, 2 Wms. Saund. 175, n. a., Lord
*Mansfield*, 2 Ev. Poth. 136, *Blackstone*, J., 2 Com. 31, *Ab-
bott*, C. J., 5 B. & A. 215, and *Dallas*, C. J., C. B. Moore
558.

From causes which are not now apparent, neither of these
views prevailed, and the consequence was that no title to
any easement could be supported upon proof of occupation

and enjoyment, however long continued, if its origin could
be shown.

The natural and, indeed, necessary consequence of a rule
so absurd, and one necessarily productive of so unjust
consequences, was that the courts were driven to evade it
by refinements and fictions. It seems by the case of *Guern-
sey* v. *Rodbridge*, Gil. Eq. Cases 4; *S. .C.* 2 Vern. 390, un-
der the name of *Finch* v. *Resbridger*, in 1707, that the court
of chancery first adopted the principle of presuming the
former existence and loss of a deed, where a long and unin-
terrupted possession of an easement was shown. It was
not until 1761 that this principle was adopted in the courts
of common law in England. Some of the judges there
were, at times, inclined to give to this presumption the effect
of a *presumptio juris et de jure*, a legal presumption bind-
ing on both courts and juries, as a rule from which neither
had a right to depart, a presumption of a right constituting
a perfect title or bar, as the case might be. *Wilmot*, J., in
*Lewis* v. *Price* and *Dougal* v. *Wilson*, Saund. 175, a.;
*Eyre*, C. J., in *Hed* v. *Holcroft*, 1 B. & P. 400; Lord *El-
lenborough*, in *Balston* v. *Benstead*, 1 Camp. 163, and in
*Bealey* v. *Shaw*, 6 East 214; and Lord *Mansfield* in *Dar-
win* v. *Upton*, 2 Wms. Saund. 175, a. and *Mayor* v. *Horner*,
Cowp. 102.

But the current of English decisions has gone no further
than to hold that long continued and uninterrupted posses-
sion is evidence from which a jury may presume a deed.
*Keymer* v. *Summers*, B. N. P. 74; *Campbell* v. *Willson*, 3
East 294; *Gray* v. *Bond*, 5 Moore 327, *S. C.* 2 B. & B. 627;
*Cross* v. *Lewis*, 2 B. & C. 686; *Darwin* v. *Upton*, 2 Wms.
Saund. 175, a.; *Livitt* v. *Wilson*, 3 Bing. 115.

The instruction given to the jury that such proof is com-
petent evidence, from which they may infer the existence
and loss of a deed, is understood to be accompanied by a
recommendation so to find the fact, whatever may be
their individual impressions of its truth, and it seems that

verdicts rendered in conflict with 'such recommendations would be set aside, *Bealey* v. *Shaw,* 6 East 214, per Ld *Ellenborough,* C. J.; *Bright* v. *Walker,* 1 Cr. M. & R. 217, per *Parke,* B.; *Jenkins* v. *Harvey,* 1 Cr. M. & R. 894, per *Alderson,* B.

Many cases, in this country, have followed in the tracks of the English decisions, though it is apparent that, in a newly settled country like ours, where to a great extent every thing is of recent date, and the history of our towns, of our roads, farms, mills and dwellings are known, a rule like that adopted in England is in no respect adapted to our situation. On other subjects, the common law has been every where modified, to adapt it to the wants of our community. The English decisions on this subject have been but modes of evading the effect of early decisions of their courts, which have been found inconsistent with the principles of justice; and it is clearly as much within the legitimate sphere and customary action of the courts to disregard or to overrule such decisions, as it can be to evade them by nice presumptions, either of fact or of law. It was the wise course, prescribed by principle as well as by public convenience, to overrule the absurd decisions which sanctioned a fixed point in the early history of England, as the limit of legal memory, and at the same time to restore the principle upon which that decision appears to be made, that in cases where the Legislature have not fixed a precise rule of limitation, rights shall be acquired and barred by a prescription of such length of time as has been fixed by the Legislature as the proper limitation in analogous cases. *Ricard* v. *Williams,* 7 Wheat. 110; *Hunt* v. *Hunt,* 3 Met. 185.

It was to adopt here as the law, the strong view of *Wilmot,* J., in *Lewis* v. *Price,* that if a possession of twenty years is sufficient to give a man title to a house, there can be no reason why it should not be sufficient to give title to any easement belonging to the house.

Upon these views, we take the law to be here settled, as

---

is laid down by Prof. Greenleaf, 2 Greenl. Ev. § 539: " By the weight of authority, as well as the preponderance of opinion, it may be stated as the general rule of American law, that an adverse, exclusive and uninterrupted enjoyment for twenty years of an incorporeal hereditament affords a conclusive presumption of a grant, or a right, as the case may be, which is to be applied as a *presumptio juris et de jure*, wherever by possibility a right can be acquired in any manner known to the law. In order, however, that the enjoyment of an easement in another's land may be conclusive of the right, it must have been adverse, that is, under a claim of title, with the knowledge and acquiescence of the owner of the land, and uninterrupted; and the burden of proving this is on the party claiming the easement." In support of this position, he cites *Tyler* v. *Wilkinson*, 4 Mason 402; *Ingraham* v. *Hutchinson*, 2 Conn. Rep. 584; *Strickler* v. *Todd*, 10 S. & R. 63, 69; *Sherwood* v. *Burr*, 4 Day. 244; *Tinkham* v. *Arnold*, 3 Greenl. 120; *Hill* v. *Crosby*, 2 Pick. 466; *Ricard* v. *Williams*, 7 Wheat. 109; *Cooledge* v. *Learned*, 8 Pick. 504; *Sargent* v. *Ballard*, 9 Pick. 251; *Melvin* v. *Whiting*, 10 Pick. 295; *Bolivar M. Co.* v. *Neponset M. Co.*, 16 Pick. 241; *Den* v. *McCann*, 2 Penn. Rep. 331, 333; *Morgan* v. *Banta*, 1 Bibb 582; *Simpson* v. *Hawkins*, 1 Dana 306; *Shaw* v. *Crawford*, 10 Johns. 236; *John* v. *Stevens*, 3 Vt. Rep. 316. To which may be added, *Stiles* v. *Hooker*, 7 Cow. 266; 1 Kent Com. 444; 2 Hill'd Ab. 60, 61; *Shumway* v. *Simonds*, 1 Vt. Rep. 53: *Baldwin* v. *Calkins*, 10 Wend. 166; and *Miller* v. *Garlock*, 8 Barb. 153, where the principles applicable in cases of this kind are very clearly stated and condensed; *Hoyt* v. *Carter*, 6 Barb. 219; *Valentine* v. *Boston*, 22 Pick. 80; *Atkins* v. *Bordman*, 20 Pick. 302; *Littlefield* v. *Maxwell*, 31 Me. Rep. (1 Red.) 140.

In this State, in *Bullen* v. *Runnells*, 2 N. H. Rep. 255, it was said by *Woodbury*, J., and held by the court, that the most conclusive evidence as to the interests of parties in

water-courses, was the occupation of the parties during twenty years, because that is the common and peculiar mode of acquiring rights to the use of water, and because so long an occupation of a stream not navigable raises a presumption that the grants, now lost by time and accident, have passed between the parties, in conformity to the occupation.

In *Gilman* v. *Tilton*, 5 N. H. Rep. 231, *Richardson*, C. J., says: " Some have held that a term of twenty years of exclusive, uninterrupted enjoyment of the use of water, in a particular manner, is a conclusive presumption of right, *presumptio juris et de jure.*" It was not the point directly before the court, and he says no more; but we think that the remark shows that the opinion met his approval. The point decided was, that an adverse enjoyment of water for any period less than twenty years is not alone sufficient to warrant the presumption of a grant.

In the case of *Watkins* v. *Peck*, 13 N. H. Rep. 360, it was held that the adverse, exclusive use of water flowing through an aqueduct, by the owners and occupants of a house, for the term of twenty years, furnishes presumptive evidence of a grant from the owner of the land through which it is brought, to have it flow in the manner it has been accustomed to do for that period. And the learned chief justice who delivered the opinion of the court, remarks of the case : " During all that time, (more than twenty years,) the right of the plaintiffs, and those under whom they hold their lands, thus to take and use the water, has, so far as appears, not been contested by any one; nor is there any express evidence of any permission asked within the time, or of any sum paid for the use, or any acknowledgment that the use was at the pleasure of those through whose land the aqueduct passed. These facts, if they stood alone, would furnish abundant evidence of title in the plaintiffs to take and use the water, as they and others, whose estates they hold, had been accustomed to do for such peri-

od." He subsequently says, " the plaintiffs' claim does not rest upon a prescription. There is no pretence that the use has extended beyond legal memory. The plaintiffs must rely upon the presumption of a grant, arising from an undisturbed enjoyment of the use of it, flowing through the land owned by the defendant for so long a period; which may be in the nature of a prescription, except so far as time is concerned." It is apparent that the learned judge referred to a prescription such as is recognised by the ancient books of the law, founded upon such a length of possession as the memory of man does not reach to, going back to the first year of Richard I., three hundred years before the discovery of our continent. Such a prescription, of course, could not exist in this case, nor in any case arising in this country. And any attempt to reason from the nature of such a prescription, so far as it related to time, might be properly rejected. The analogy of the presumption of title, or of grant, as the case may be, to a prescription, except so far as time is concerned, is distinctly admitted. And there seems to us both convenience and propriety in applying the term prescription in cases of this kind, since the prescription of the ancient books can never exist here, and even as to time, the limit recognized here agrees with that of the civil law. Hein Ad. Pand., before cited. However this may be, this case furnishes strong evidence of the concurrence of this eminent judge in the general current of decisions in this country, as stated by Prof. Greenleaf.

Upon this view of the law, we think the instruction given to the jury, that if an owner of a mill privilege, under a claim of right, used and exercised the rights he claimed, without opposition or interruption, for a period of twenty years, this gave him a perpetual right, was, upon the facts presented by the case, correct, unless the court erred in that part of the charge where they say that the exercise of the rights claimed for twenty years, without interruption, entitled the plaintiff to a verdict, notwithstanding they should find that during

a part of that time the title to the property affected was, by descent, in the hands of minors.

This question, in a different form, came before the court in the case of *Watkins* v. *Peck,* and it was there said: "We are of opinion that no grant can be presumed from an ad- verse use of an easement in the land of another, for the term of twenty years, where the owner of the land was, at the expiration of the twenty years, and long before, incapa- ble of making any grant, whether the disability arose from infamy or insanity. Perhaps a disability intervening during the lapse of the term, but not extending to the termination of the twenty years, might not be sufficient to rebut the presumption, but it would be absurd to presume a grant, where it was clear that no such grant could have existed." This case is relied on by the defendants as decisive of the present case, but we are unable so to regard it.

In the present case, the period of twenty years, necessary to give a title by presumption of a grant or title, commenced in 1807, and ended in 1828, after which time the right was denied, and its exercise interfered with. From 1822 to 1826, the title of the defendant's estate, in which the easement was claimed, was in the minor children of Kelso, the former owner, then deceased, and their interest was sold in 1826, by their guardian, by license from the court of probate. The disability of the owners did not extend to the end of the twenty years, but ceased two years previously. That case was not decided in *Watkins* v. *Peck,* but was in ex- press terms left undecided.

The case then before the court did not require the decis- ion of any question on the subject, since it was held that the then defendants taking the water by contract from the premises of a third person, could justify, under that person, if they could not stand on their own occupation. But it is not necessary here to question the ruling there made, in the case then before the court.

But we think that, in the present case, where it appeared

that the parties interested were of full age at the time when the possession and user commenced, and for fifteen years after; and also at the time when the full time of twenty years was completed, and for two years before, and the title of the minors intervened for some three or four years between those periods, their disability would not prevent a title from being acquired by twenty years possession.

We have already stated our impression that by the law, as generally recognized in this country, the party claiming title under such possession, is not obliged to rely merely on a presumption of a grant, but he may rest on a presumption of right, or of any grant, reservation or record, which may be necessary to establish his title; and it seems to us this may properly be regarded as a species of prescription, established here by a course of judicial decisions, by analogy to the statute of limitations of real actions. *Cooledge* v. *Learned*, 8 Pick. 504; *Melvin* v. *Whiting*, 10 Pick. 295.

In cases where the party claiming title under such presumption, may find it necessary to rely upon the presumption of a deed, we think that long continued user is evidence of a lost or non-existing grant, from some person who might, at some time, have made a valid grant to some person capable of accepting it. It cannot prove more than this. User cannot prove a grant by A. to B., on a given day, unless there be other circumstances, which confine the presumption to a particular time, and to those persons only. The evidence of such limitation forms no essential or natural part of the proof of user. *Campbell* v. *Wilson*, 3 East 294; *French* v. *Marstin*, 4 Foster's Rep. 453.

It strikes us that the legitimate and natural tendency of evidence of user may, in many cases, be rather to prove a deed existing before the commencement of the user, than one executed during the time of the use, or at its termination. *Tinkham* v. *Arnold*, 3 Greenl. Rep. 122. The earliest act of user proved, tends to prove a right then existing, upon the principle that he who witnesses any encroachment

upon his rights, without objection or opposition, seems to admit, in some degree, however slight, a right in the party who does it. Such light evidence gains force by continued repetition, until at the end of twenty years it becomes, unexplained, conclusive evidence of right.

This species of prescription being established here upon the necessity existing among us, of some mode of determining the rights to easements, of a more rational character than the ancient rule of prescription, reaching back to the time of legal memory, and applicable to all cases, the analogy of the statute of limitations, by which the period of twenty years is adopted as the time of prescription, seems reasonable and proper to be followed likewise, as to the exceptions prescribed by that statute. Those exceptions are of two kinds, the case of a reversioner against whom the statute does not begin to run, and by parity of reason, the time of prescription does not begin to run until his interest becomes vested, so as to give him a right of action. The tenant for life or years may grant easements, or permit them to be acquired by user, and they will be valid against himself and those who hold his estate during its continuance, and perhaps not afterwards, where the reversioner had previously neither cause nor right to complain. *Daniel* v. *North*, 11 East 370; *Bradbury* v. *Gimsell*, 2 Wms. Saund. 175, d.; *Barker* v. *Richardson*, 4 B. & A. 579; Ang. Adv. Enj. 46; 2 Greenl. Ev. § 545.

Owners who are under disabilities when their rights are first encroached upon, and the right of action for such encroachment first accrues, have by the statutes five years to bring their actions, after the disability is removed, though the period of twenty years may have long expired. *Foster* v. *Marshall*, 2 Foster's Rep. 491. In such a case, we think there would be the strongest reason for applying to the privileges of the house the same rule we apply to the house itself, and to allow to the disabled owner the rule that he may have five years to contest his liability, after his disability has

ceased. But under the statute it has always been held that after the statute has once commenced to run, no intervening disability will defeat the ordinary limitation arising from twenty years adverse possession. *Howell* v. *Zouch*, Plowd. 353; *Doe* v. *Jesson*, 6 East 80; *Eager* v. *The Commonwealth*, 4 Mass. Rep. 182; *Jackson* v. *John*, 5 Cow. 74; *Griswold* v. *Butler*, 3 Conn. Rep. 227; *McFarland* v. *Stone*, 17 Vt. Rep. 165; *Mercer* v. *Selden*, 1 How. 37, and 17 Pet. 37.

The same rule seems to us proper to be applied, in case of disabilities arising to the owners of real estate, after the user and enjoyment of an easement has been commenced under a claim of right, with the knowledge of the owner, and without question or opposition on his part. Such intervening disabilities should not defeat the presumption of title resulting from twenty years possession. *Tyler* v. *Williamson*, 4 Mason 402; 2 Kent's Com. 445; 2 Greenl. Ev. 545; *Cross* v. *Lewis*, 2 B. & C. 686; Best on Presumptions, 89; Ang. Watercourses, 235.

The point relative to the award is not insisted upon, and the plaintiff's answer to it seems sufficient.

*Judgment on the verdict.*