EAST TENNESSEE IRON & COAL CO. et al. v. WIGGIN et al.

(Circuit Court of Appeals, Sixth Circuit. June 4, 1895.)

No. 265.

1. COURTS—TERMS.

Unless sooner adjourned, a term of a United States circuit court may extend from the beginning of one term to the opening of the succeeding statutory term, and does not necessarily end at the opening of a term held, pursuant to statute, in another place in the same district.

2. ADVERSE POSSESSION—TENNESSEE STATUTE.

Under the Tennessee statute (Mill. & V. Code, §§ 3459–3461) providing that any person having had seven years' adverse possession, under color of title, of lands granted by the state, is vested with a good and indefeasible title in fee, adverse possession, with color of title, for the statutory period, extinguishes the title of the excluded owner, and bars him from recovering the land even from one whose title is defective.

3. SAME—COLOR OF TITLE.

A grant of land from the state, void because of the existence of a prior grant, and a sheriff's deed, purporting to convey land not embraced in an attachment from which the sole right of the sheriff to convey arose, are both sufficient color of title, under the Tennessee statute, of adverse possession.

4. SAME—ACCUMULATION OF DISABILITIES.

Under the Tennessee statute of adverse possession, the disability of an heir, who is beyond the limits of the United States at the time of descent cast, cannot be added to that of his ancestor, who was also beyond such limits during the period of adverse possession.

5. ABANDONMENT—TITLE TO LAND.

There can be no abandonment of a legal title to land by mere failure to assert it, in the absence of adverse possession.

In Error to the Circuit Court of the United States for the Northern Division of the Eastern District of Tennessee.

This was an action of ejectment by Augustus Wiggin and others against the East Tennessee Iron & Coal Company and Lucien Bird. Judgment was rendered in the circuit court for the plaintiffs for a part of the land claimed. Defendants bring error. Reversed.

This is an action of ejectment brought to recover a tract of mountain land containing 5,000 acres, lying in Campbell county, Tenn. The plaintiffs below claimed title through and as heirs at law of one Timothy Wiggin, a subject and resident of Great Britain, who died in London, February 1, 1856. Plaintiffs' ancestor acquired title by deed in 1840, but never resided in the United States or had any actual possession of the lands in controversy. He left surviving him seven heirs, four of whom have continuously resided "beyond the limits of the United States and the territories thereof." The other three stirpes have been residents of the United States since 1865. The defendants in possession claimed under inferior and junior paper titles, except as to one parcel of 50 acres, held under an older and superior grant. These junior grants for lands within plaintiffs' grant were as follows: (1) Grant No. 28,171, to John McCoy, dated August 21, 1851, for 200 acres; (2) grant No. 28,172, to John McCoy, dated October 21, 1851, for 1,000 acres; (3) grant No. 27,939, to Jacob Hammon, dated April 10, 1851, for 2,000 acres. The defense as to the lands held under these junior grants depended upon the statute of limitations. There was a judgment for the defendants as to the lands held under the grants for 50 and 200 acres, respectively, and for three undivided sevenths, being the interest of the resident heirs of Timothy Wiggin in the McCoy grant for 1,000 acres. For the rest there was a judgment for the plaintiffs. From this judgment the defendants have sued out this writ of error.

W. A. Henderson, for plaintiffs in error.
Henry H. Ingersoll, for defendants in error.

Before TAFT and LURTON, Circuit Judges, and SEVERENS, District Judge.

After stating the facts as above, the opinion of the court was delivered by LURTON, Circuit Judge:

There is a preliminary question for decision relating to the legality and sufficiency of the bill of exceptions. The cause appears to have been tried with a jury in February, 1894. A motion for a new trial was made and overruled February 9, 1894. The bill of exceptions is dated June 21, 1894. Appellees say that this was after the term had closed. This insistence is based upon the provisions of the statute prescribing the terms of the circuit court for the Eastern district of Tennessee. The statute provides for terms at Knoxville beginning the second Mondays in January and July, and at Chattanooga, in the same district, beginning the first Mondays in April and October. The argument is that, when the Chattanooga term began, the Knoxville term was necessarily at an end. This is not sound. Section 612, Rev. St., provides that circuit courts may be held at the same time in the different districts of the circuit. By section 611, cases may be heard and tried by each of the judges authorized to hold the circuit court, sitting apart and concurrently. Unless sooner adjourned, a term of the United States circuit court may extend from the beginning of one term to the opening of the succeeding statutory term of the same court. The practice has in this circuit been almost universal to keep the court open from one statutory term to the succeeding regular term. This bill of exceptions was allowed and signed before the beginning of the ensuing term, and is altogether regular and valid.

Appellees have also insisted that it does not sufficiently appear that exception was taken to the charge or refusals to charge at the time the charge was delivered or refused. The bill of exceptions has not been prepared with that degree of care and accuracy which might be expected from the learning and skill of the attorneys representing appellants. Still it is evident, upon a fair and careful construction of the paragraph reciting the exceptions taken by appellants, that the expression "then and there excepted" refers to the time when the court charged or refused to charge as requested, and not to the later day when a motion for a new trial was overruled.

There was evidence tending to show that John McCoy, the grantee under grant No. 28,172, took adverse possession under his junior grant as far back as between 1849 and 1853, and therefore during the lifetime of Timothy Wiggin, the ancestor of plaintiffs, and that his possession was continued down to some time during the Civil War, when he abandoned his occupation, and disappeared amid the smoke and dust of that conflict, leaving no trace behind, and has not since turned up. This evidence tended also to show that this adverse occupation was under a grant purporting to convey a fee. Beginning during the lifetime of Timothy Wiggin, it was continuously main-

tained for a period of more than seven years, including more than three years after descent cast upon the plaintiffs below. Defendants below endeavored to connect themselves with McCoy's title through a sheriff's deed made in 1870, purporting to convey certain lands which had been levied on and sold as the lands of McCoy, to satisfy a debt due to James Williams, the vendee under the sheriff's deed. Williams, in 1877, conveyed the land embraced in his deed to one L. Silcox, who, in 1886, conveyed the same land to defendant Bird. There was evidence tending to show that, after Williams took his sheriff's deed, he took possession, and that that possession had been kept up by himself or those who succeeded to his title for some 12 or 15 years before this suit was brought. The proceedings upon which the sheriff's deed to Williams was founded were not operative to convey the title to the 1,000-acre grant now under consideration. The suit was begun by attachment of McCoy's lands as a nonresident. The levy of the attachment did not embrace this particular body of land, and no liberality of construction will justify the subsequent inclusion of this parcel in the sheriff's deed of 1870. That deed was therefore inoperative as a conveyance of McCoy's title, and was properly held by the district judge as useful only as color of title.

Appellants insisted that the effect of the evidence as to McCoy's adverse possession was to extinguish the Wiggin title, and vest in McCoy the superior legal title, and that plaintiffs could not recover upon a title which had been thus annulled by adverse possession for the period required by the Tennessee statute. They also insisted that the subsequent adverse possession of Williams, Silcox, and Bird, under deeds purporting to convey the fee, was adverse to the title acquired by McCoy, and resulted in its extinguishment, and that thereby defendants had acquired the perfect legal title. Their further insistence was that it was wholly unimportant whether the sheriff's deed to Williams was operative as a conveyance of McCoy's title, and equally unimportant whether they connected themselves with the McCoy possession or not, provided his possession was operative to toll the superior title originally in Timothy Wiggin.

The Tennessee limitation of actions for the recovery of land is found in sections 3459–3461, Mill. & V. Code. Those sections are from the Tennessee act of 1819, and were carried into the Code without change. They are as follows:

"3459. Any person having had, by himself or those through whom he claims, seven years' adverse possession of any lands, tenements, or hereditaments, granted by this state or the state of North Carolina, holding by conveyance, devise, grant, or other assurance of title, purporting to convey an estate in fee, without any claim by action at law or in equity, commenced within that time and effectually prosecuted against him, is vested with a good and indefeasible title in fee to the land described in his assurance of title.

"3460. And, on the other hand, any person, and those claiming under him, neglecting for said term of seven years to avail themselves of the benefit of any title, legal or equitable, by action at law or in equity, effectually prosecuted against the person in possession, as in the foregoing section, are forever barred.

"3461. No person, or anyone claiming under him, shall have any action, either at law or in equity, for any lands, tenements or hereditaments, but within seven years after the right of action has accrued."

By the express terms of section 3459, the effect of an adverse possession for a period of seven years, without suit commenced within that time and effectually prosecuted, is to vest in the adverse possessor, provided his possession was held under a deed, grant, or other conveyance of title purporting to convey an estate in fee, "a good and indefeasible title in fee to the land described in his assurance of title." Possession, without color of title, under the Tennessee statute, is a mere defense, and is inoperative as an assurance of title. Crutsinger v. Catron, 10 Humph. 24; Marr's Heirs v. Gilliam, 1 Cold. 510; Hopkins' Heirs v. Calloway, 7 Cold. 37. But, under the long-settled construction of section 3459, the effect of adverse possession taken and held under an assurance of title is not only to bar the action of the person ousted, but extinguishes the title of the excluded owner, and vests in the possessor an indefeasible title, operative as a muniment of title superior to any and all others. Waterhouse v. Martin, Peck (Tenn.) 406; Belote v. White, 2 Head, 712; McClung v. Sneed, 3 Head, 221; Hopkins' Heirs v. Calloway, 7 Cold. 46; Nelson v. Trigg, 4 Lea, 705, 706; Hanks v. Folsom, 11 Lea, 562. The junior grant under which McCoy took possession was color of title under this section of the Tennessee act, although the land had been previously granted. The sheriff's deed to Williams, though void as a conveyance of McCoy's title, was operative as an assurance of title. Ellege v. Cooke, 5 Lea, 637; Blantire v. Whitaker, 11 Humph. 311; Martin v. Pryor, 12 Heisk. 668; Thurston v. University of North Carolina, 4 Lea, 519.

It must therefore follow that, unless plaintiffs are within the operation of some exception to this statute of limitations, defendants were entitled to go to the jury upon the question of the character and duration of the McCoy possession, as well as upon the character and extent of the subsequent possession under the deed purporting to convey McCoy's title. A plaintiff in ejectment must recover upon the strength of his own title, and is not aided by the weakness of that of his adversary. If the Wiggin title was extinguished by operation of an adverse possession by McCoy, then it is most obvious that plaintiffs have no title upon which they can maintain an action, and the question as to whether defendants have acquired the title which they have lost is an immaterial matter. There can be but one good and indefeasible legal title. The plaintiff in ejectment must have that, or his suit must fail, and this is all there is in the defense of an outstanding title. If the title is not in the plaintiff, he cannot recover. Whether it is in the defendant or outstanding in a third person, the result must be the same. Bleidorn v. Mining Co., 89 Tenn. 188, 189, 15 S. W. 737; Walker v. Fox, 85 Tenn. 160, 2 S. W. 98.

Precisely what is meant by "an abandoned" legal title is hard to define. If it is the valid legal title, it is inconceivable how it can be abandoned. McCoy's disappearance and long neglect to assert the title which appellants claimed he acquired by his adverse possession did not operate to extinguish or toll it; nothing but a possession adverse to him for the statutory period would have such a

consequence. Plaintiffs did not abandon their title by neglecting for 40 years to take possession or bring action. If there has not been a devolution of title by operation of an adverse possession, their title is perfect, and their right of recovery would not be affected by a theoretical abandonment predicated alone upon a neglect of their estate. Upon the same ground, it is hard to perceive how McCoy's title has been lost by mere neglect for a shorter period. Nothing but a subsequent possession adverse to McCoy for the statutory period will affect the title acquired by his own earlier possession adverse to the Wiggin title.

This brings us to the question as to whether the plaintiffs, or those under whom they claim, are within any exception to the statute we have been considering. Undoubtedly, Timothy Wiggin, the ancestor of plaintiffs, was within the saving clause of the statute. He never resided within the limits of the United States or the territories thereof.

By section 3451, Mill. & V. Code, it is provided as follows:

"3451. If the person entitled to commence an action is, at the time the cause of action accrued, either, (1) within the age of twenty-one years; or. (2) of unsound mind; or, (3) a married woman; or, (4) beyond the limits of the United States and the territories thereof; such person. or the representatives and privies, as the case may be, may commence the action after the removal of such disability, within the time of limitation for the particular cause of action, unless it exceed three years, and in that case three years from the removal of such disability."

Thus, Timothy Wiggin might have sued at any time within three years after the "removal of his disability"; i. e. his coming within the "limits of the United States and the territories thereof." He died in London in 1856. The contention of defendants below was that McCoy's adverse possession began several years before his death, and that his heirs were obliged to sue, or be forever barred, within three years after the title came to them. Four of the heirs have remained continuously beyond the limits of the United States. Three other sets of heirs came to America about 1865. Now, it is evident that, unless the fact that the heirs of Timothy Wiggin were themselves beyond the seas when their intestate died operates to place them under the disability or saving provision of the statute, they were required to bring suit against McCoy within the limitation of the statute, or within three years after descent cast. This they did not do. If, therefore, McCoy's possession began within the lifetime of Timothy Wiggin, and was continuous for seven years, including three years after his death, then the necessary legal consequence was that plaintiffs' title was tolled, and McCoy acquired a good and indefeasible title as to all the land within his assurance of title.

Cumulative disabilities are not allowed under statutes saving a right of action for a definite period after removal of a disability existing when an adverse possession began. McDonald v. Johns, 4 Yerg. 257; Guion v. Anderson, 8 Humph. 326; Young v. Jones, 9 Humph. 551; Alvis v. Oglesby, 87 Tenn. 182, 10 S. W. 313. This principle has been widely applied: Lewis v. Marshall, 5 Pet. 470; Mercer's Lessee v. Seldon, 1 How. 37; Thorp v. Raymond, 16 How.

247; Hogan v. Kurtz, 94 U. S. 779; Floyd's Heirs v. Johnson, 2 Litt. (Ky.) 114; Jackson v. Wheat, 18 Johns. 40; Parsons v. McCracken, 9 Leigh, 495.

That there shall be no accumulation of disabilities is distinctly provided by section 3453 of the Tennessee Code, which reads as follows:

"3453. No person can avail himself of a disability unless it existed when his right of action accrued; but when two or more disabilities then exist, the limitation does not attach until all are removed."

These principles have equal bearing upon the 2,000-acre tract held under grant to Jacob Hammon. There was evidence tending to show that Hammon began adverse possession several years before the death of plaintiffs' ancestor, and that this possession was continued for more than seven years, including a period of more than three years after his death. Appellees have insisted that Hammon's possession was not of such a character as to be the open and notorious possession necessary to start the statute. The evidence as to this is not of such a character as to enable us to say that the error of the circuit court in regard to the effect of adverse possession upon plaintiff's title was harmless. There was evidence of adverse possession, and defendants were entitled to a correct charge as to the effect of such possession if they found it to be open and notorious.

The appellants presented the questions of law we have discussed in four distinct requests for instruction. Each request was refused. The charge was for the most part in distinct antagonism to the doctrine embodied in these requests. For the error in the charge as to the necessity of a connection between McCoy's adverse possession and the subsequent possession adverse to McCoy, and for the error in refusing the charges requested by appellants, the judgment must be reversed, and a new trial awarded.