Earnest v. Little River Land & Lumber Co.

EARNEST *et al. v.* LITTLE RIVER LAND & LUMBER
COMPANY.

(*Knoxville.* September Term, 1902.)

**1. LAND LAW. GRANT BY STATE.** Conveys to first
grantee the absolute title in fee, leaving nothing to be
thereafter disposed of.

Primarily the title to land is vested absolutely and indefeasibly in the State and this title, where the land is granted by
the State pursuant to statutes authorizing grants, passes
to the *first grantee*, leaving nothing to be thereafter disposed
of—nothing upon which a subsequent grant can operate.
(*Post, p.* 432.)

Cases cited and approved: Crutsinger *v.* Catron, 10 Humph.,
27; Coal Co. *v.* Wiggins (C. C. A.), 68 Fed. Rep., 449.

**2. SAME. SAME.** Same. First grant conclusive upon
State and junior grantees.

The *first grant* by the State, like the first patent by the United
States of part of the public domain, carries the fee and is
conclusive not only against the State, but all claiming under
junior grants, unless it is void on its face, and junior
grantees take nothing by their grants. (*Post, pp.* 431-433.)

Cases cited and approved: Bagnell *v.* Broderick, 13 Peters,
450; Hooper *v.* Scheimer, 23 How., 235; Johnson *v.* Towsley,
13 Wall., 72; Gibson *v.* Chouteau, 13 Wall., 92.

**3. SAME.** Adverse possession, under color of title, for seven
years vests possessor with absolute title in fee.

Where the State, by grant, has divested herself of title to certain lands and a person has held adverse possession thereof
for a period of seven years under an assurance of title purporting to convey a fee, the statute (Acts 1819, ch. 28,
sec. 1) takes away the title of the real owner, and transfers
it, not in form, but in legal effect to the adverse possessor

and thus vests him with an absolute estate in fee simple. (*Post, pp.* 432-439.)

Code construed: Ses. 4456 (S); 3459 (M. & V.); 2763 (T. & S. and 1858).

Cases cited and approved: Wallace *v.* Hannum, 1 Humph., 449; Waterhouse *v.* Martin, Peck, 393; Norris *v.* Ellis, 7 Humph., 464; Belote *v.* White, 2 Head, 712.

Case overruled: Coal Creek Co. *v.* East Tenn. Co., 105 Tenn., 563.

**4. SAME. Same. Case in judgment.**

Where the State made three successive grants of the same lands, and after those claiming under the grantee in the third grant had been in adverse possession for seven years, the grantees in the second grant, the complainants herein, brought suit claiming that such adverse possession had, by extinguishing the title given by the first grant, vitalized or infused title into their intermediate grant, by virtue of which they have both the right of property and the right to the possession of their lands as against the defendants.

HELD: That by virtue of the operation of the first section of the act of 1819, the effect of the adverse holding by defendants was to draw to, and vest in them, the absolute and indefeasible title which the first grantees received from the State under their grant. (*Post, pp.* 429-439.)

FROM SEVIER.

Appeal from Chancery Court of Sevier County. JOHN P. SMITH, Chancellor.

LUCKY, SANFORD & FOWLER and S. T. LOGAN, for complainants.

WEBB & McCLUNG and M. B. McMAHON, J. R. PENLAND and PICKLE & TURNER, for defendants.

MR. CHIEF JUSTICE BEARD delivered the opinion of the Court.

This is an ejectment bill filed to recover a large body of land lying in Sevier county. Several matters of minor importance were presented at the bar, but, confessedly, as the case involves one controlling or determinative question, to avoid confusion we will state only so much of the record, and that in a condensed form, as bears on this question.

The State issued three series or classes of grants, which interlap so as to cover the lands in controversy, at different dates and to different persons. The older grants were issued in the year 1838 to grantees who are not parties to this suit, and, who, so far as is disclosed, are not setting up title under their grants. The intermediate grants are conterminous, and were issued to the ancestor of the present complainants in the year 1841, and the junior grants at a still later date.

The complainants claim under the intermediate grants, and the defendants under the later grants. But, in addition to this claim, the defendants rely on the fact that before the institution of this suit, they had themselves, and through their privies, held continuous, exclusive, adverse, and peaceable possession of these lands within the interlap of these grants for the full term of seven years, and under an assurance of title purporting to convey an estate in fee.

As against parties claiming under the grants first in

the order of issuance, it is conceded that the defendants, by this adverse holding, have obtained the superior title, but the contention of complainants is that such holding has not been operative against them; to the contrary, that the removal or extinguishment, as they say, of the first grants, by this adverse possession, has vitalized or infused title into their intermediate grants, by virtue of which they have both the right of property and the right to the possession of these lands as against defendants. In other words, the defendants insist that, under the first section of the act of 1819, the effect of this adverse holding is to invest them with an "indefeasible title in fee," good against all the world. On the other hand, the complainants contend that this possession of defendants has extinguished the first or superior grants, and at the same time set at large the intermediate grants under which they claim, and they are now the muniments of the true title, enforceable against the defendants and all others. Is such claim maintainable on principle or authority?

We think it may be safely asserted that, if an individual owner in fee, for a valuable consideration, should make and deliver a deed conveying to a purchaser, without reservation, a tract of land, such writing would take out of the owner all estate, and vest it in the vendee. So, the registration laws out of the way, a second and third deed from the vendor to other parties, in which he undertook to convey to

them the same property, would be waste paper, in no way affecting the title or estate of the first conveyee. But a very different condition would be brought about, should the third grantee go into possession of the land, and hold it adversely for the term of seven years. Then, under the first section of the act of 1819, he would secure what, up to the moment of the expiration of this term, the first grantee had, an estate in fee, good and indefeasible, not only against the first grantee, but against all invaders of his rights, including, of course, the intermediate grantee. In such a case no one would claim that the loss of estate by the first inured to the benefit of the second, as against him, whose assurance of title had ripened into an indefeasible title. If this be true, then there must be found some intelligent and well-defined distinction between private and public grants, to give a different effect to an adverse holding under the last of a series of grants of the same property from the State. Such distinction, at least, is not found in patents for public lands issued by an officer acting under authority of the statutes of the United States. In such case the "patent carries the fee, and is the best title known to a court of law." *Bagnell* v. *Broderick,* 13 Pet., 450 (10 L. Ed., 235). It is the highest evidence of title, and is conclusive against the government and all claiming under junior patents or titles, until set aside or annulled, unless it is absolutely void on its face. *Hooper* v. *Scheimer,* 23

How., 235 (16 L. Ed., 452) ; *Johnson* v. *Towsley,* 13 Wall., 72 (20 L. Ed., 485) ; *Gibson* v. *Chouteau,* 13 Wall., 92 (20 L. Ed., 534). We can conceive of no reason, and none is suggested at the bar, why the same is not true as to grants issued by the State. The title to the land is primarily in the State. It is there absolutely and indefeasibly, save by its own act. Ultimately it sees proper to part with a portion of its domain, over which it is lord paramount, and does do so by the issuance and delivery of a grant in which the property is confirmed to the grantee, without limitation or condition. Held by the State, it was a fee simple absolute, and such an estate passes by the terms of the instrument to its grantee. Nothing remains in the State to be afterwards disposed of. The estate in the land is gone, and there is nothing left upon which a subsequent grant can operate. It is true, there are exceptional cases in which this rule will not control, such as when a younger grant is made to relate to an older special entry, but the present is not one of those cases. This rule is applied uniformly in controversies between parties claiming land under successive grants, where the statute of limitations is out of the way. In such a controversy, the claimant under the older grant will always succeed, upon the ground that by it the State had parted with all estate in the land. It is true that it has been found that the State has often issued a number of grants to the same land; but this was without war-

rant of law, and has resulted either from carelessness upon the part of the officials of the State, from incorrect surveys, or possibly other causes.   The courts have been burdened with litigation growing out of the multiplication of grants, but nowhere has it ever been intimated that there were two or more titles to the same land, which might be parceled out in a series of grants.   There is but one "good and indefeasible title," as is said by Judge Lurton, in *Coal Co.* v. *Wiggins,* 15 C. C. A., 510 (68 Fed., 449), and this title passes to the first grantee, "and as it is impossible," says Judge Reese in *Crutsinger* v. *Catron,* 10 Humph., 27, "that there shall be a good, subsisting legal title in two different persons, claiming in different rights to the same land," we think it clear that, as the State has nothing left to dispose of, subsequent grantees obtain nothing.

Leaving, however, these general considerations, which seem to dispose of the present controversy, inasmuch as it would follow that the intermediate grantees took nothing covered by the first grants, we return to the specific question, did the adverse holding by the defendants of the property located within the interlap of all the grants, as hereinbefore set out, serve to draw to them or vest in them the absolute title to this property, which they can maintain against every comer, or did it simply extinguish the rights of the first grantee or grantees, and leave them exposed to the substantive rights and the aggressive attacks of

complainants, under the cover of their intermediate grants?

This brings us to an examination of the first section of the act of 1819, which, in substance, is carried into Shannon's Code, secs. 4456-4458, and reads as follows:

"Sec. 4456.    Any person, having had by himself or those through whom he claims, seven years' adverse possession of any lands, tenements, or hereditaments, granted by this State, or the State of North Carolina, holding by conveyance, devise, grant, or other assurance of title, purporting to convey an estate in fee, without any claim by action at law, or in equity, commenced within that time and effectually prosecuted against him, is vested with a good and indefeasible title in fee to the lands described in his assurances of title.

"Sec. 4457.    And on the other hand, any person and those claiming under him, neglecting for the said term of seven years to avail themselves of the benefit of any title, legal or equitable, by action at law, or in equity, effectually prosecuted against the person in possession, as in the foregoing section, are forever barred.

"Sec. 4458.    No person, or any one claiming under him shall have any action at law or in equity, for any lands, tenements, or hereditaments, but within seven years after the right of action has accrued."

The conditions that lead to the passage of this celebrated act are recorded in the opinions of the courts

of that day. *Barton's Lessee* v. *Shall,* Peck, 218; *Wallace* v. *Hannum,* 1 Humph, 449 (34 Am. Dec., 659) ; and *Dyche* v. *Gass' Lessee,* 3 Yerg, 401. But nowhere are they more graphically portrayed than in the preamble to the act itself, which is in these words, "Whereas many disputes have arisen with regard to the proper construction of the statute of limitations, and the time seems fast approaching, when the titles to land will become so perplexed that no man will know from whom to take or buy land," and to remedy these evils this legislation was enacted. The act is drawn with great precision in the use of terms, and, even if it was not a part of the judicial history of the State that it was drafted by an eminent lawyer, itself would give evidence of the work of a master hand. What, then, was meant by the provision that a party holding "by himself, or those through whom he claims, adversely under an assurance of title purporting to convey an estate in fee, without any claim by action at law, or in equity," commenced within seven years, is vested with a good and indefeasible title in fee to the land described in his assurance of title?" The eminent author of this act, as well as the legislature and the courts of that day, well knew the technical meaning of the term "title in fee." They were well aware that it defined a full and absolute estate, beyond and outside of which there was no other interest, or even shadow of right. So, when the act vested the adverse holder with such a title, it clothed

him with an estate which was good, not only against him who had been the owner, but against the whole world—a title in which was blended actual possession, the right of possession, and the right of property. 4 Kent, Comm., 580. It was an "indefeasible" title in fee or estate, with which its owner could repel all attacks upon, and expel all invaders from, its possession. This title, thus vested by operation of law, from whence did it come? Not from the State, because the State had already parted with its interest. Not from any subsequent grantee of the same land, for he had none. It seems to us, from no other source than him—the first grantee—whose laches had lost what the diligence of the adverse possessor had acquired.

By operation of this statutory provision, the estate or title which was in the first taker until the last moment of the seven-years' adverse holding was divested out of him, and at the same instant vested in the adverse holder or possessor. Thus it is that the grant or deed of the original owner becomes an empty shell, without any element of force or life, and the estate in the land, having passed from him, thereafter vests in the adverse possessor, and in him is "good and indefeasible." In other words, "the statute takes away the title of the real owner, and transfers it, not in form indeed, but in legal effect, to the adverse occupant," and thus clothes him with a "perfect title." 3 Washb., Real Prop., 163-165.

An examination of our cases, we think, will disclose,

with one exception, that this has been the uniform construction of this act.   We refer on this point particularly to *Wallace* v. *Hannum,* supra; *Waterhouse* v. *Martin,* Peck, 393; *Norris* v. *Ellis,* 7 Humph., 464; *Belote* v. *White,* 2 Head, 712; *Hopkins' Heirs* v. *Calloway,* 7 Cold., 46.

In *Wallace* v. *Hannum,* 1 Humph., 450 (34 Am. Dec., 659), Judge Green states his understanding of this section as follows: "In order that a party shall be protected, who has held possession of land for seven years, he must claim the same by some assurance of title which purports to convey an estate in fee simple.   In such case it not only protects his possession, but in express words it confers on him the title.   He shall have a good and indefeasible title in fee simple."

In *Belote* v. *White,* 2 Head, 712, Judge Wright says: "The act of 1819 bars equitable as well as legal titles, and operates as an extinguishment of the same, and invests the possessor of the same with a perfect title in fee simple.   Whenever the equitable owner is *sui juris,* and can sue, but omits to do so for seven years, the entire title and fee are by the statute placed in the possessor.   And this is so, though the legal title be in a trustee, and whether he be capable of suing or not."

In *Norris* v. *Ellis,* 7 Humph., 464, Judge Reese bears this testimony as to the proper construction of the act of 1819: "The titles which are perfected by the bar of the statute, and which draw to them the better title, are thus enu-

merated in the first section of the act, which purports to convey to the possessor, or those for whom he claims, an estate of inheritance."

So, in *Hopkins' Heirs* v. *Calloway,* 7 Cold., 46, Judge Andrews says of the proper construction of this act: "Under the operation of the first section, an adverse possession of seven years under a deed, grant, or other assurance of title, purporting to convey a fee, not only bars the remedy of the party out of possession, but vests the possessor with an absolute estate in fee simple."

The effect, as we understand these cases, of such adverse holding, is, as Judge Reese expresses it in *Norris* v. *Ellis,* supra, that there is drawn to such holder the "better title," or, as tersely put by Judge Haywood in *Waterhouse* v. *Martin,* supra, "The adverse possessor acquires what his adversary loses."

It would hardly seem necessary, yet, to prevent all possible misinterpretation of our holding, it is not improper to say that, while it happens in the present case the defendants connect with the grantees of the third class, this was not essential to their successful defense under the first section of the act of 1819. For it is too well settled to admit of doubt, or to require at this late day an array of cases in support, that, to give the adverse holder the benefit of this section, it is only necessary that he be in possession of granted land, and under an assurance of title purporting to convey an estate in fee, without regard to the source of such assurance.

But it is said that we have decided other-
wise in the case of *Coal Creek Consol. Coal
Co.* v. *East Tennessee Iron & Coal Co.*, 105
Tenn., 564 (59 S. W., 634), and the rule of *stare decisis*
is invoked. The opinion in that case was delivered
at the September term, 1900, of this court, and is
therefore of too recent date to have become a rule of
property in the State. That being so, the doctrine
of *stare decisis* is not so inflexible as to require us to
adhere to it, when upon further examination we dis-
cover error in the conclusions announced. We will
not stop to inquire what, if any, are the distinguish-
ing features between that and the present case, but
will content ourselves with saying that, in whatever
respect it may conflict with our present holding, it is
overruled.

### DISSENTING OPINION.

MR. JUSTICE WILKES delivered the following dis-
senting opinion.

I earnestly, but respectfully dissent from the views
of the majority in this case. The holding is contrary
to that in *Coal Creek Consol. Coal Co.* v. *East Tennes-
see Iron & Coal Co.*, 105 Tenn., 563 (59 S. W., 634),
which was the unanimous opinion of the whole court
in a case where the questions considered were directly
involved. It is now proposed to overrule that case
by an opinion concurred in by a bare majority of
three; Justice Neil being incompetent, though prob-
ably holding the view of the majority.

The present case is reported by the court of chan-
cery appeals to be distinguishable from the Coal Creek

case in important particulars. This is conceded by counsel for defendants in their brief, and it is argued that because of these differences the Coal Creek case is not controlling or applicable. One of the differences pointed out is that in the Coal Creek case there was no adverse possession as to the intermediate grant of complainant, while in this case the possession is adverse to the intermediate as well as to the original grant. Such a difference is vital, and probably would, even under the holding in the Coal Creek case, have forced this court to a different conclusion in that case. While, therefore, the correctness of the decision of this court in the Coal Creek case does not properly arise in the present case, as the majority have seen proper to overrule it, I desire to say that, in my opinion, it was correctly decided, and is not successfully impeached in this case, nor can it be, upon its controlling features. The Coal Creek case received the most mature consideration when it was before the court. Every feature now argued was then most carefully examined and unanimously agreed to. No new authorities have been presented; no new arguments have been made, and the same counsel have relied substantially upon the same printed briefs and oral arguments.

I only desire to consider two features passed on by the majority, but, in my opinion, not necessarily involved in the present case. The first is whether the original title is tolled and brought to the support of the title of the adverse holder under color of title. Before entering upon the consideration of this feature,

Earnest v. Little River Land & Lumber Co.

I only desire to say that the expression "toll the title" is not properly used by counsel to express their meaning. To "toll a title" does not mean to draw that title to another. Bouvier defines the term "toll" as follows: "To bar, defeat, or take away, as to toll an entry into lands is to deny or take away the right of entry." 2 Bouv. Law Dict., p. 598. In its proper legal sense, the original title is tolled—that is, it is defeated and taken away; but it is not tolled in the sense of being kept alive and drawn to the adverse holder. The fundamental error of the majority, in my opinion, is in maintaining that the adverse holding must be coupled to the original title, and derive its indefeasibility therefrom. To strengthen this view, they rely upon the general statement that there can be but one true title, and, since the original title is assumed to be the true title, it must be brought to the support of the adverse title, so as to make it appear that the adverse holder is in of right, whereas he is in simply by force of the statute, not as of right in as a disseizer, and not as a holder of the true title. It would seem to be a work of supererogation to cite authorities to such a proposition, if it were not for the opinion of the majority holding to the contrary..

In 1 Cyc. Law & Proc., 1083, the doctrine is thus laid down: "Whenever this defense [of adverse possession] is set up, the idea of right is excluded; otherwise the statute of limitations would be of but little use for protecting those who could not otherwise

show an indefeasible title to the land," citing *Smith v. Burtis,* 9 Johns., 174; *Pillow v. Roberts,* 13 How., 472 (14 L. Ed., 228). The effect of adverse holding under color of title is a disseizin of the prior estate; that is, in the language of Mr. Preston: "It takes the seizin or estate from one man, and places it in another. . . . It is the commencement of a new title, producing that change by which the estate (not the title) is taken from the rightful owner and placed in the wrongdoer. As soon as a disseisin is committed, the title consists of two divisions—First, the title under the (new) estate and seisin; and, second, the title under the former ownership." 2 Prest Abst., 284; 3 Washb. Real Prop. (3 Ed.) 118; Tied. Real prop., sec. 693.

"Disseizin" and "ouster" mean very much the same thing as "adverse possession." Id. Disseizin is always a wrongful dispossession; *i. e.,* it is never supported by a good title. Tied., Real Prop., sec. 694. This court has already commented upon the expression found in 3 Washb., Real Prop., 163-165. *Coal Creek Consol. Coal Co.* v. *East Tennessee Iron & Coal Co.,* 105 Tenn., 574 (59 S. W., 634). In addition to what was then said as the view of the court, I desire to add that the statement of Mr. Washburne is supported by no authority, and none is cited. Mr. Tiedeman, commenting on it, says: "Mr. Washburne says that the operation of the statute takes away the title of the true owner, and transfers it, not in form, indeed, but in legal effect, to the adverse occupant."

And he adds: "The statute may have the effect of destroying the title of the owner altogether and for all purposes, but it can not be said to transfer it to the disseizor. His title is acquired by adverse possession, and it is only made perfect by rendering the rightful owner powerless to defeat it, either by entry or ejectment. The only real value of this distinction lies in the settlement of a question arising under the subject of title by abandonment."

Considering our own cases, it is conceded that the adverse holder under color of title must show that the land held has been granted by the State to some one, because the statute so provides; and, from the very reason of the law, there can be no adverse holding of land which the State has never granted, but it is not required that the adverse holder must connect himself with the original grant, or that it can bring any further support to his title under the adverse holding.

It was long a controverted question in this State whether the adverse holder must connect himself with the original grant, but the question has been settled ever since the case of *Gray* v. *Darby's Lessee,* Mart. & Y., 396-426, decided in 1825 by Judge Catron, which terminated a long and spirited controversy. See note of Judge Cooper, page 426, Mart. & Y., and note to *Weatherhead* v. *Bledsoe's Heirs' Lessee,* 2 Tenn., 352.

A perfect system and network of decisions has been built up on this holding, contrary to that of the majority, and in accord with the holding of Judge

Catron in *Gray* v. *Darby's Lessee*. The cases are too numerous to mention. Thus, a voidable deed, a void deed, a fraudulent deed, a forged deed, a sheriff's deed based on a void tax sale, a deed under a void decree, an unregistered deed, a decree for partition, an entry, a title by decent cast, and a title by devise have all been held to be an assurance of title, which, coupled with adverse possession, will confer an indefeasible title. And yet in none of these cases is it necessary or practicable to connect the title of the adverse holder with the original grant, or that the latter be brought to the support of the title of the adverse holder. If the original title or grant must be brought to the adverse title, then all the intermediate links must be brought, also, so that the result is, that the adverse holder makes his title indefeasible by showing a chain of conveyances from the State, and not by operation of the statute; and the act is therefore of no force of virtue, and has no practical effect. The true holding is that the title gained by adverse possession, coupled with the color of title, becomes indefeasible, because it extinguishes the original title, and substitutes for it a new one created by the statute. As this new title derives its indefeasibility under the law from an adverse possession, it is only indefeasible as to the title to which the possession has been adverse. That the original title is extinguished is held by a vast array of cases in Tennessee and elsewhere, and that it is kept alive and brought to the support of the adverse

title is held in none, except in a dictum in *Norris* v. *Ellis,* 7 Humph., 464.   In *Belote* v. *White,* 2 Head, 712, cited by the majority, it is said:   "The act of 1819 bars equitable as well as legal titles, and operates as an extinguishment of the same, and invests the possessor with a perfect title in fee simple."   That the act operates to "extinguish" the original title is expressly held by many authorities.   Wood, Lim. Act, 499, 563; Cooley, Const. Lim., 365; *Trim* v. *McPherson,* 7 Cold., 18; *Belote* v. *White,* 2 Head, 712; *McClung* v. *Sneed,* 3 Head, 222; *Hanks* v. *Folsom,* 11 Lea, 562; *Leffingwell* v. *Warren,* 2 Black, 599-605 (17 L. Ed.,261) ; *Bicknell v. Comstock,* 113 U. S., 149 (5 Sup. Ct., 399 28 L. Ed., 962) ; *Coal Co.,* v. *Wiggins,* 15 C. C. A., 510 (68 Fed. 449 (opinion by Lurton, J.)—all referring to the operation of the statute as an extinguishment of the original title, in express language and terms.

To repeat:   The substance of virtually all the cases is that the adverse title becomes indefeasible by force of the statute alone, and because it extinguishes the original title, and not because it draws that title to its support, or derives any aid from it.   The majority opinion relies upon expressions used in *Wallace* v. *Hannum,* 1 Humph., 443 (34 Am. Dec., 659) ; *Hopkins' Heirs* v. *Calloway,* 7 Cold., 46; *Waterhouse* v. *Martin,* Peck, 393; *Norris* v. *Ellis,* 7 Humph., 464. All these cases, and the expressions used in them, were thoroughly considered in the Coal Creek case,

and were then explained as having a meaning differ-
ent from that now ascribed to them, except, perhaps,
the case of *Norris* v. *Ellis,* 7 Humph., 464.    The
language used by Judge Reese in the latter case was
mere dictum, as the case, involved was one of adverse
possession only, and not of adverse possession with
color of title; and the language used in regard to the
latter class of cases was not, perhaps, intended to be
exact, but, if so, was, and only could be, dictum.

The majority opinion asks the question, "Where
does this indefeasible title or fee come from?" and
answers it, "Not from the State, because the State had
already parted with its interest, but from no other
source than from the first grantee, whose laches had
lost what the diligence of the adverse possessor had
acquired."    And yet nothing is better settled than
that the adverse possessor does not derive his title
from the original grantee, but adversely to him, and
only because of his open, continued and notorious
holding adversely to him.

It is important that there should be stability in
the holding of the court, whether that holding has
become a rule of property or not; and, when a holding
is overruled, it should be for sound reasonings or new-
ly discovered authorities, and never unless a question
is directly and unavoidably involved.

The second determinative proposition is involved
in more of doubt and question then that already con-
sidered.    Counsel for the defendants state the case

thus:   Three grants were issued by the State for the same land,— the older one, to A.; the second one, to B.; the third one, to C.   Complainants claim under the second or B, grant; defendants, under the third or C. grant.   The insistence is that the first grant to A. passes the entire title and interest of the State to A., and the subsequent grants to B. and C., passed no interest whatever and were void, and neither party could recover, because neither has any title.   Grant A. is not before the court.   The holding of the majority is, in substance, that a second grant or a second deed has no vitality and is absolutely void.   I am of opinion that a grant or deed regular upon its face is *prima facie* valid, and its validity must be shown and not presumed.   It is evident that a second grant is not without some potentiality.   When it issues upon an older entry, it carries the title, even as against the first grant; and yet, under the opinion of the majority, it must necessarily be void, because the first grant had deprived the State of any power to make a second one, and had divested it of all estate and title in the land. Concede that the first grant does divest all interest in the land out of the State; it does so only when that grant is valid and regular and sufficient to convey the title.   The majority opinion assumes this validity, regularity, and sufficiency simply from the fact that it is prior in point of time, while, in my opinion, such validity, regularity, and sufficiency are not presumed against another grant regular upon its face, and it

becomes superior to the second only after being brought into contest with it and prevailing over it,— in other words, by being shown to be valid. So, also, by analogy, a second deed becomes superior title if it is first registered; and yet, on the theory of the majority, it must be absolutely void, because the grantee, after he had conveyed by the first deed, could not make a second one, and had nothing to convey. The majority dispose of this feature by simply saying there are exceptions, but they give no explanation how in these exceptional cases title could remain in the State or grantee sufficient to authorize a second deed.

By Acts 1777, ch. 1, sec. 11, it is provided that every grant must be registered in the county where the land lies, within twelve months after issuance, or it shall be void. If a grantee should refuse to register his grant or take possession and ownership of his land, and should abandon it and leave the State, as thousands have done, must it forever remain unappropriated, because, forsooth, the State can not make a second grant, even when the first was abandoned? It may be said that it is a condition subsequent that the grant shall be void, of which the State alone can take advantage. Grant this. Does not the State take this advantage when it issued the second grant? If the first grant is irregular and defective, can not the State issue a second one that is regular and valid?

In case of a deed, a vendor for full value parts with all his title, and does it in good faith. His vendee

fails to register it and the vendor makes a second deed to an innocent purchaser, which is first registered, and becomes the true title; and yet all the title had passed by the first deed out of the grantor, and nothing could, in the opinion of the majority, pass by the second. Now, the original grantees under the first grant are not before the court. Whether they are now setting up any claim to the land, does not appear. So far as this record shows, they never took under the grant, or, if they did, they do not now claim, and the legitimate presumption of law and fact is they have long since abandoned any claim they have, because of the invalidity of their grant, or for other reasons. The holding of the majority is, in effect, that the defendants may set up this first original title as one outstanding, in order to defeat complainants. And if it is prior in point of time, it is prior in point of right, without regard to whether it is regular or irregular, while the proper position is that it must be tested before it can be said to be good.

The authorities all hold that an outstanding title which has been abandoned, defeated, reverted, barred, or extinguished can not be set up as a defense by defendants. *Peck* v. *Carmichael,* 9 Yerg., 328; *Dickinson's Lessee* v. *Collins,* 1 Swan, 519; *Howard* v. *Massengale,* 13 Lea, 577; *Jackson* v. *Hudson,* 3 Johns., 375; *Jackson* v. *Todd,* 6 Johns., 257; *Greenleaf* v. *Brith,* 6 Pet., 302 (8 L. Ed., 406); *Humble v. Spears,* 8 Baxt., 159; *Crutsinger* v. *Catron,* 10 Humph., 24.

Cates 1-15

Now it appears from the record that, in an eject-ment suit brought heretofore by the first against the second and third titles, it was defeated before this suit was brought, so that the original title is decreed to be barred and defeated. How, then, can it be brought to the support of defendant's title? It is upon the idea of abandonment or extinguishment that the whole theory is based, that by virtue of adverse possession and the statute of limitations, whether with or without color of title, the inferior becomes the superior title, in the one case as offering a defense, and in the other of conferring a new title. But it is only where the possession is adverse, and notoriously so, that it meets the requirements of the statute; and, while a possession may be adverse as to all titles, it does not always follow that it is so. To illustrate the fallacy of the holding of the majority, we suppose A. has color of title to 100 acres, with adverse possession on ten acres. B. has adverse possession of ten acres within the same 100-acre boundary. Now, it is evident A. can not recover B.'s ten acres, because he has not held adversely to him, but, on the contrary, B. has held adversely to A. and is protected by the second section of the statute. What would be the effect if B. had also held under color of title, as well as A., we do not stop to consider. Every grant by the State is presumably and *prima facie* valid, and its invalidity must appear before it can be rejected, and this invalidity only appears after a contest, unless void on its face.