CONSOLIDATED BRICK CO., PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket Nos. 23120, 30506.   Promulgated October 10, 1929.

*Alex M. Hamburg, Esq.*, for the petitioner.

*Bruce A. Low, Esq.*, and *L. H. Rushbrook, Esq.*, for the respondent.

OPINION.

MILLIKEN:[1] We will first discuss the issues raised in Docket No. 23120. All the issues asserted in the petition filed under this docket number, except that with respect to the clay reserve, relate to invested capital.

In its petition filed under Docket No. 23120, petitioner seeks a deduction of $1,986 for clay reserves at Elmira, alleged to have been abandoned in 1920, when the plant at that place was scrapped. This claim must be denied. In the first place, we do not know what

---

[1] This decision was prepared during Mr. Milliken's term of office.

was the cost of the clay. In the petition, it is alleged that petitioner purchased 9 acres of land for the sum of $10,000, of which 7 acres consisted of a clay reserve. At the hearing petitioner introduced as its witness one who had been associated with petitioner and its predecessors for over 21 years in the capacity of general superintendent and secretary. This witness testified that there were 7 acres of clay land; that of this about 4 acres were untouched when the plant at Elmira was scrapped, and that these 7 acres cost $500 per acre. Thereafter, petitioner introduced as a witness a certified public accountant, who had made two visits to the plant—the first, a one-day stay in 1926, and the second, a later visit, the duration of which the witness could not remember. This witness testified:

Q. Have you also made an examination of the books and records and if so will you tell us what they show with respect to the acquisition cost of the clay lands at Elmira? You are reading now from a memorandum made after your examination of such books and records?

A. Yes. There were seven acres which cost in total $10,000. At the rate of 5 cents a thousand brick and calculating the number of available brick in the entire tract of seven acres, the clay portion of the clay lands amounts to $3,388, which is the cost of $484 per acre.

Thus, we find it alleged in the petition that the 9 acres cost $10,000; that the only witness who was connected with petitioner testified that the 7 acres of clay land cost $500 an acre, or $3,500, and last, a certified public accountant, who testified that the 7 acres of clay land cost $10,000. From the above we are unable to determine cost. Neither do we know whether this land was purchased prior or subsequent to March 1, 1913, and if purchased prior thereto, we are not informed as to its market value on that date. There is no evidence that this clay reserve was abandoned in 1920, whatever may be the intended meaning of the word " abandoned." The one witness who was conversant with what was actually done, the secretary and manager of the company, did not testify on this issue. The only testimony in which the word " abandoned " appears is that of the certified public accountant, who did not visit the Horseheads plant until 1926, or six years after the scrapping of the Elmira plant, and who does not appear to have seen the Elmira plant. To the question, " From the time of acquisition to 1920, which was the year that the Elmira plant lands were abandoned, how many acres were added to the Elmira clay lands?," he answered " None." The allegation in the petition is not that petitioner abandoned the lands which it owned at Elmira, but that it abandoned undepleted clay reserves in the land. There is nothing in the record which in the slightest degree indicates that petitioner did not own the land and the clay therein throughout the taxable year. In fact, in the brief filed in its behalf, petitioner admits that it did not abandon the " surface of the land." How it could abandon what was underneath the surface and still own the

surface is incomprehensible. While petitioner did scrap its plant at Elmira in 1920, it still owned the real estate. In *A. J. Schwarzler Co.*, 3 B. T. A. 535, on a quite similar state of facts, we denied a similar deduction, saying:

It is well settled that title to real property can not be lost by abandonment alone. 1 Corpus Juris. 10. In Ruling Case Law, p. 2, section 2, it is stated:

"The characteristic element of abandonment is a voluntary relinquishment of ownership, whereby the thing so dealt with ceases to be the property of any person and becomes the subject of appropriation by the first taker."

In the case of *East Tennessee Iron & Coal Co.* v. *Wiggin*, 68 Fed. 446, 449, Judge Lurton, who delivered the opinion of the court, said:

"Precisely what is meant by 'an abandoned' legal title is hard to define. If it is the valid legal title, it is inconceivable how it can be abandoned."

\*   \*   \*   \*   \*   \*   \*

\* \* \* Losses from dealing in real or personal property, growing out of the ownership thereof, are deductible only when ascertained and determined upon an actual, completed, and closed transaction during the taxable year, and are not sustained through the mental processes by which a taxpayer determines that the property is worthless and charges it off on its books, while it still retains the title to the property itself.

We now approach the question of invested capital. The pertinent provisions of the Revenue Act of 1918 are as follows:

Sec. 326. (a) That as used in this title the term "invested capital" for any year means (except as provided in subdivisions (b) and (c) of this section):

(1) Actual cash bona fide paid in for stock or shares;

(2) Actual cash value of tangible property, other than cash, bona fide paid in for stock or shares, at the time of such payment, but in no case to exceed the par value of the original stock or shares specifically issued therefor, unless the actual cash value of such tangible property at the time paid in is shown to the satisfaction of the Commissioner to have been clearly and substantially in excess of such par value, in which case such excess shall be treated as paid-in surplus: \* \* \*

(3) Paid-in or earned surplus and undivided profits; not including surplus and undivided profits earned during the year;

(4) Intangible property bona fide paid in for stock or shares prior to March 3, 1917, in an amount not exceeding (a) the actual cash value of such property at the time paid in, (b) the par value of the stock or shares issued therefor, or (c) in the aggregate 25 per centum of the par value of the total stock or shares of the corporation outstanding on March 3, 1917, whichever is lowest;

Petitioner seeks to have included in its invested capital the sound value of the assets shown by the appraisements of April 28, 1911, and January 24, 1924. The amounts shown by such appraisements are claimed as the true cash value of the tangibles "bona fide paid in" for petitioner's capital stock as of the date of petitioner's organization on January 19, 1910, which was about 15 months prior to the date of the first appraisal. This was the date of which the appraisals fixed the value and determined that the assets were in existence. In discussing this question we are forced to take cog-

nizance of two vital facts—first, that just prior to the consolidation the Horseheads Company had suffered a disastrous fire, and, second, that the consolidation was effected on the basis of equality of value of the assets of the two predecessor companies.

It is shown by the evidence that a clay shed erected in 1870, which was separate from the main plant, and a blacksmith shop also so situated, were not touched by the fire. With these exceptions, all else that could burn except a small part of the roof over the kiln was burned. We may here state that the kiln could not burn but that it was damaged by the fire. On the questions of the effect of the fire and the basis of consolidation, but one witness testified, and he was petitioner's secretary, to whom we have referred. Being asked whether certain machines went through the fire, he said:

Q. They had gone through the fire?
A. Everything had gone through the fire.
Q. Was their condition then—they had been repaired after the fire in 1910, that is, in 1910 was a time after the fire they had been repaired at the time this consolidation occurred. Is that correct?
A. No, your Honor, I would not say that.
Q. They had not been or had they been?
A. At the beginning of January 1, 1910, repair work was started and in progress. I would not know whether one thing at the beginning of 1910 had been done on the pans. They were working at this or that, as the weather permitted in the open winters and snow and things in the air, we will say on the first of January, was not a permissible time to do outside work and get up any building and make repairs on the damaged machine, so that the first of January, 1910, would find little left at the plant, only damaged machines and relics of the fire, because it was in winter.

Again he testified:

Q. Have you mentioned substantially everything that was there now at the Horseheads plant? I am thinking of things now of substantial value.
A. Your Honor, there were all kinds of tools and small items in the building that was all consumed, shovels and picks. You might find something here and there, but after a fire it cleans up.
Q. It was practically destroyed by fire?
A. Yes, at the beginning of January, all we had, these wrecks of machines and what the fire could not burn.

The same witness testified:

Q. Immediately after the fire, or at January 19, 1910, which was during the following year, was there, I repeat, on January 19, 1910, a brick machine room?
A. Immediately after the fire there was darn little there outside of the north clay shed. We started rebuilding what was there on any particular specified day—I can't recall on January 20, where they had the machine room—I know we were rebuilding, but what was there on any day or time, I could not recall the whole thing. It was not completed until the summer was half over, before the plant was rebuilt and ready for operation.

Testifying as to the effect which the fire had on the consolidation, this witness stated:

Q. Were any of the assets written off as a result of the fire at the Horseheads plant?

A. I think the accounts were readjusted in this particular; the amount of value to offset the Elmira stock covered an item of $10,000 cash in the Horseheads accounts extra which would assist in placing things back even with the Elmira concern. I am speaking now about 1910, January 1910, which I assume is the point you are driving at.

Q. Yes, sir. Was that cash actually paid in?

A. It was put on deposit at the First National Bank at Horseheads.

Q. Who put it in?

A. R. G. Eisenhart, as treasurer of the Horseheads Brick Company and he was the Horseheads Brick Company largely.

Q. He put in $10,000?

A. He had to, because he suffered a fire loss, and the Elmira would have taken a burned down plant to off-set what they had, without evening up for an adjustment for share for share between them, and that was the understanding, that they were to have $10,000 with the salvage of the old plant and $10,000 cash to balance the value between plant and plan otherwise Horseheads would be figured on a higher valuation than Elmira.

It thus appears that the men who had long owned and managed these two plants and who were thoroughly conversant with their true values determined that the deal should be made on a fifty-fifty basis, and that by reason of the fire the then existing assets of the Horseheads plant, although it had a larger capacity and was the more favorably situated of the two, were worth $10,000 less than the assets of the Elmira Company, and that to equalize these values this sum was paid in by Horseheads' principal stockholder. This testimony also explains the write-off of values on the books of the old companies. The certified public accountant, who personally knew nothing of these facts, testified that the write-off of machinery was in his opinion excessive, forgetting that these concerns were established in 1870 and 1880, respectively, and that one was incorporated in 1895 and the other in 1903, and that neither had made any allowance on their books for depreciation or obsolescence. He further stated that the write-off of real estate was improper, since real estate could not depreciate. What the market value of such real estate was when paid in to petitioner in 1910 does not appear; further, we do know that the clay reserves were being actually exhausted by depletion year by year. It is pertinent to point out that petitioner does not now question the value of the real estate agreed upon between the parties. We do know, however, that these were the values fixed by men of experience in the business and who were dealing in arm's length. The fact that these values appear in round numbers instead of being carried out in the final decimals does not affect our conclusion that the values set up at the date of the consolidation were

the true cash values of the assets paid in. While cost may be set out in detail, values are generally estimated in round numbers.

While petitioner, in the brief filed in its behalf, has assailed these various amounts as not being truly representative of the cash value of the various assets paid in for stock, it does not deny that the consolidation was effected on the basis of equality of the value of the assets. The stockholders of each predecessor company were to pay in practically the same amount in value and were to receive precisely the same amount of the capital stock. This equality would be utterly destroyed if we accept appraisals as showing the cash value of the assets of the two companies as of January 19, 1910, when they were paid in for stock. Adjusting the values of the Elmira plant agreed upon between the parties by substituting the appraised values for the agreed values, we find that the total value of the assets paid in by that company would be the sum of $60,597.83, and deducting from this the additions made between January 19, 1910, and April 28, 1911, as shown by the books, in the sum of $2,076.08, we find the net value of the assets paid in of $58,521.75, or only $521.75, in excess of the value agreed upon between the parties. On the other hand, making similar adjustments of the value of the assets of the Horseheads Company, we find that the appraised values, plus the value of real estate, plus cash paid in, plus accounts receivable, less additions shown by the books to have been made between January, 1910, and April 28, 1911, would amount to the sum of $106,268.02. It thus appears that if we accept the appraisals as showing the value of assets in existence on January 19, 1910, the result would be that the assets paid in by the Horseheads Company were of nearly double the value of the assets paid in by the Elmira Company.

We are asked by petitioner to hold that the stockholders of the two predecessor companies, who were men who had been long connected with the management of these concerns and were thoroughly conversant of the values not only of their respective plants, but of both plants, and who were dealing on the basis of equality of value of assets, were so ignorant of the true value of their plants that one paid in nearly twice the value paid in by the other. We are requested to hold that the value of "only damaged machines and relics of the fire" at Horseheads in January, 1910, was equal to the value of the rebuilt and reconstructed plant appraised in April, 1911. We are unable to make such determination. Nor are we helped by the showing of the books that about $32,000 was expended in the reconstruction. On this point, the books are of little help. Petitioner has taken pains to point out that these books do not reflect all capital expenditures. It may well be that wages of those who helped to construct the plant were charged to expense. Petitioner has asked

us to find and we have found that such items as lumber, hardware, gravel and cement, though applicable to capital items, were charged on the books to expense. So far as we are informed, this may account for at least a part of the difference between the agreed price and the appraisal. However this may be, the fact remains that all that was in existence at the date of the consolidation was the real estate, one old clay shed, one blacksmith shop and fire wreckage. On the question of the value of the assets of the two predecessor companies in their condition on January 19, 1910, we have no evidence except the values placed upon them by the parties themselves, and this we accept. Petitioner had, as of the date of its organization, a paid-in surplus of $14,000.

At the hearing petitioner amended its petition and sought the inclusion in its invested capital of the value of intangibles alleged to have been paid in for stock at the date of its organization. It requests us to find that the average earnings of the predecessor companies for the years 1903 to 1909, inclusive, amounted to $30,944.63 per year. We have no competent evidence before us upon which to base such a finding. Petitioner's secretary gave it as his recollection that the net earnings of the two companies prior to consolidation would average about $20,000 per year, and although he had repeatedly stated that he was not competent to value the assets, item by item, he stated that in his judgment on the basis of earnings the businesses of the two companies were worth about $200,000. That this witness had no true conception of the term "net earnings" is shown by the following testimony, given in response to questions as to what he considered net earnings and dividends:

A. Yes. If I owned all the stock in the company and I was the company and the company was me, I can take it out as dividends or salaries. You can call it earnings, dividends or salary. What is the difference?

Two other witnesses, who took part in making the appraisals but who had no other personal knowledge relative to the matter, in answer to hypothetical questions based on supposed earnings of $20,000 per year, also testified that the sum of $200,000 was the fair value of the business. In order to make this testimony worth while, it remained for petitioner to establish the basis of his hypothetical question, that is, the true net earnings of the constituent companies. For this purpose it placed on the stand the certified public accountant to whom we have referred, and he filed in evidence a statement showing "the average earnings [not net earnings]" of the two predecessor companies for the six years prior to the consolidation to be in the amount of $30,944.63, of which he attributed the sum of $11,163.12 to the Elmira Company and $19,781.51 to the Horseheads Company. He testified that he compiled his statement from the

books but on cross-examination it developed that his statement did not reflect the earnings shown by the books, but his own private opinion of what the books should have shown. It appeared that two stockholders were receiving salaries of $50 and $100 per month, respectively, and were paid at the end of certain years larger amounts, ranging from $5,000 to $8,000, which were charged on the books as " special salaries." Without any knowledge as to why these charges were made, this witness took the liberty of attributing these items not to expenses but to earnings. The books were produced at the hearing and were there available and this witness could easily have told the Board what the books actually showed and then have explained to the Board why the earnings should be increased by other items, leaving it to the Board to decide whether his contentions were right or wrong. He did not have the right to substitute his judgment for the judgment of the Board. In arriving at the above estimate of earnings, this witness made no allowance for depreciation. In the absence of competent proof as to earnings, we are unable to find any value for the intangibles of either of the predecessor companies.

There is a further obstacle to the inclusion in invested capital of good will or other intangible values, if such values in fact existed, and that is that there is no evidence before us which in the least indicates that any intangible was paid in at the date of organization or at any other time for the stock of petitioner. It was not until the hearing was well advanced that it occurred to petitioner's counsel to make such a claim. In this state of case the burden rests heavily upon petitioner to establish, among others, two pertinent facts—first, that such intangibles were bona fide paid in for stock, and, second, the par value of the total shares of stock of petitioner outstanding on March 3, 1917.

There is no evidence whatever on the second requirement.

With respect to the first requirement, it is not shown that petitioner issued its stock for a mixed aggregate of tangibles and intangibles. See *St. Louis Screw Co.*, 2 B. T. A. 649. The set-up on petitioner's books on January 19, 1910, shows that the stock of petitioner was issued solely for tangibles. It further appears that the plant of Horseheads Company was the older; had the greater production capacity; was the better situated, and, according to the statement filed by the certified public accountant, had average annual earnings nearly double the earnings of Elmira Company. In this state of affairs, it would seem that if good will had been paid in for stock, a larger part of the stock issued would have been allocated to the stockholders of Horseheads Company. What actually happened was that the tangibles only were valued and paid in and that

it was the judgment of all concerned that the tangibles of Horseheads Company were worth $10,000 less than those of Elmira Company, and to equalize this difference the principal stockholder of Horseheads Company paid in $10,000 in cash. The stockholders of both companies were concerned only with the value of tangibles and only tangibles were paid in for capital stock.

Since intangibles can not be allowed in an amount in excess of the par value of the stock issued therefor; since it has not been shown that intangibles had actual existence or value, or that they were paid in for stock; and since we are not informed as to the amount of petitioner's stock outstanding on March 3, 1917, we are compelled to hold that petitioner's invested capital should not be increased by reason of any intangible assets. See *Daily Pantagraph, Inc.*, 9 B. T. A. 1173, and *Daily Pantagraph, Inc.* v. *United States*, decided by the Court of Claims, June 10, 1929.

It appears that at the date of organization petitioner had a surplus of $14,000. Since this amount was paid in for shares of stock it can not be reduced by depreciation or depletion. This is not true of earned surplus. Earned surplus may be reduced by depreciation and depletion. See *Simons Brick Co.*, 14 B. T. A. 878, and cases cited. Cf. *Milton Dairy Co.* v. *Willcutts*, 275 U. S. 215.

We are unable to afford petitioner any relief with respect to the additions to the fixed assets account shown by petitioner's books for the period April 28, 1911, to March 1, 1913, as set forth in our findings of fact, since we are not informed of what action respondent took with respect to them. For all we know, respondent may have allowed all such items in invested capital. So far as we are advised, respondent accepted all capital items shown on the books. The capital items which we have found to have been charged on petitioner's books to expense, which we have found respondent disallowed, and the total sum of which is $5,301.67, should be charged to capital account, with proper reflection in surplus. Since it does not appear that these items represent paid-in surplus, they are subject to depreciation and should be included in surplus at their depreciated value.

Petitioner invites our attention to the fact that its capital and surplus, as shown by its books as of the beginning of the year 1920, amounted to the sum of $153,070.72 and asserts that such surplus should not be reduced, except it be affirmatively shown that the books did not truly represent the true facts. It also asserts error on the part of respondent in that he computed depreciation on the abandoned Elmira plant at $28,961.93, whereas petitioner's books show depreciation in the amount of only $17,827.51. It further complains that surplus should not be reduced by any depreciation, since it claims depreciation was met and equaled by repairs. The evidence of record is insufficient to bear out the last statement. With respect

to the reduction of surplus and the increase in depreciation, it is sufficient to say that petitioner not only admits, but charges, that its books did not correctly represent its capital assets, and it is further clear that at least until 1916 the petitioner's books made no provision for depreciation or obsolescence. Petitioner admits the correctness of respondent's depreciation rates and is now seeking a larger depreciation by reason of the inclusion of higher values of depreciable assets. Its position with respect to depreciation before March 1, 1913, and subsequent thereto is as inconsistent as is its position with reference to what constitutes net earnings prior and subsequent to that date.

Respondent's affirmative plea in its amended answer to the effect that he erred in allowing depreciation for the years 1920 and 1921 on an excess valuation of $53,634.48 we will discuss in connection with petitioner's alleged error in Docket No. 30506.

All the issues raised by the petitioner in Docket No. 30506 which have not been waived, relate to depreciation. The first of these issues brings up again the values found in the appraisals by the American Appraisal Co. We rejected these appraisals in so far as invested capital was concerned, for the reason that the appraisal of the Horseheads plant as of April, 1911, when it had been reconstructed, does not disclose the true value of the fire wreckage which existed in January, 1910. We accepted the values placed upon both plants by the books of petitioner because they were determined by the men interested and who were thoroughly conversant with the values of their own assets. The difference between the agreed value at the date of organization and the appraised value of the Elmira plant, taking into consideration adjustments between the date of organization and that of appraisals, was only about $500, and we accepted the agreed value for the reason that we were not fully informed of all that occurred between January, 1910, and April, 1911. On the other hand, we feel assured that the assets appraised in April, 1911, were in fact in existence on that date. When we compare the values of the Elmira assets, as determined by the appraisals, with those agreed upon by the parties 15 months before, and when we add to the agreed value the capital expenditures as shown by the books, remembering that the books did not disclose all the capital expenditures, we feel assured that the appraised value of the Elmira plant represented the true " sound values " of the assets of that plant as of the date of appraisal. The appraisals of the assets of the Horseheads plant were made at the same time and by the same men. The appraisal of the Elmira plant shows that the appraisal is fairly representative of value, and for this reason we accept the appraisal of the Horseheads plant as showing true sound value of the assets of

that plant on April 28, 1911, when the plant was fully reconstructed. We are further of opinion, under all the facts of these proceedings, that the fair market value of these assets on March 1, 1913, would be equal to the appraised values, less depreciation at the rates proposed by respondent and not disputed by petitioner, and which are disclosed in our findings of fact.

Petitioner is entitled to a deduction for depreciation on the values shown by the appraisals. This disposes adversely of the contentions made by respondent's answer in Docket No. 23120 and of all the issues raised by the petitioner in Docket No. 30506.

*Judgment will be entered under Rule 50.*